# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## <u>Appeal No. 2013-1574</u>

ZHEJIANG NATIVE PRODUCE & ANIMAL BY-PRODUCTS
IMPORT & EXPORT CORP., KUNSHAN FOREIGN TRADE CO.,
CHINA (TUSHU) SUPER FOOD IMPORT & EXPORT CORP.,
HIGH HOPE INTERNATIONAL GROUP JIANGSU FOODSTUFFS
IMPORT & EXPORT CORP., NATIONAL HONEY PACKERS & DEALERS
ASSOCIATION, ALFRED L. WOLFF, INC., C.M. GOETTSCHE & CO.,
CHINA PRODUCTS NORTH AMERICA, INC., D.F. INTERNATIONAL
(USA), INC., EVERGREEN COYLE GROUP, INC., EVERGREEN
PRODUCE, INC., PURE SWEET HONEY FARM, INC., and
SUNLAND INTERNATIONAL, INC,

                              Plaintiffs-Appellants,

              v.

UNITED STATES,

                             Defendant-Appellee,

           and

SIOUX HONEY ASSOCIATION and
AMERICAN HONEY PRODUCERS ASSOCIATION,

                             Defendants-Appellees.

Appeal from the United States Court of International Trade in
case no. 02-CV-0057, Judge Richard K. Eaton

## DIRECT BRIEF FOR PLAINTIFF-APPELLANT

Bruce M. Mitchell
Mark E. Pardo
Ned H. Marshak
John M. Foote
Andrew T. Schutz

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN &
KLESTADT LLP
399 Park Ave., 25th Floor
New York, New York 10022

November 18, 2013

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ZHEJIANG NATIVE PRODUCE V US, 2013-1574

## CERTIFICATE OF INTEREST

Pursuant to Rule 47.4 of the Rules of the U.S. Court of Appeals for the Federal Circuit, counsel for Plaintiffs-Appellants, Zhejiang Native Produce & Animal By-Products Import & Export Corp., Kunshan Foreign Trade Co., China (Tushu) Super Food Import & Export Corp., High Hope International Group, Jiangsu Foodstuffs Import & Export Corp., National Honey Packers & Dealers Association, Alfred L. Wolff, Inc., C.M. Goettsche & Co., China Products North America, Inc., D.F. International (USA) Inc., Evergreen Coyle Group, Inc., Evergreen Produce, Inc., Pure Sweet Honey Farm, Inc., and Sunland International, Inc., certify the following:

1.      The full name of every party or *amicus* represented by me is:

Zhejiang Native Produce & Animal By-Products Import & Export Corp., Kunshan Foreign Trade Co., China (Tushu) Super Food Import & Export Corp., High Hope International Group, Jiangsu Foodstuffs Import & Export Corp., National Honey Packers & Dealers Association, Alfred L. Wolff, Inc., C.M. Goettsche & Co., China Products North America, Inc., D.F. International (USA) Inc., Evergreen Coyle Group, Inc., Evergreen Produce, Inc., Pure Sweet Honey Farm, Inc., and Sunland International, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest)

Not applicable.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

Not applicable.

4.      The names of all law firms and the partners or associates that have appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Bruce M. Mitchell, Mark E. Pardo, Adam M. Dambrov and Ned H. Marshak of the law firm Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (GDLSK) appeared in the trial court below and Mark E. Pardo, Bruce M. Mitchell, Ned H. Marshak, John M. Foote, and Andrew T. Schutz of GDLSK are expected to appear in this court.

Date: November 18, 2013                     /s/*Mark E. Pardo*
                                             Mark E. Pardo
                                             Counsel for Plaintiffs-Appellants

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................................1

   1.   APPEAL IN OR FROM THE SAME CIVIL ACTION PREVIOUSLY BEFORE THIS
   COURT ...........................................................................................................1

   2.   CASES KNOWN TO COUNSEL TO BE PENDING IN THIS OR ANY OTHER COURT
   THAT WILL DIRECTLY AFFECT OR WILL BE DIRECTLY AFFECTED BY THIS COURT'S
   DECISION IN THE PENDING APPEAL ...........................................................2

JURISDICTION...............................................................................................2

ISSUES PRESENTED FOR REVIEW.............................................................3

   A.   WHETHER THE CIT WAS OBLIGATED TO TREAT THIS COURT'S LEGAL
   RULINGS FROM PREVIOUS STAGES OF THIS LITIGATION AS LAW OF THE CASE.......3

   B.   WHETHER THE DEPARTMENT SHOULD BE REQUIRED TO CONDUCT FURTHER
   PROCEEDINGS IN LIGHT OF THIS COURT'S RULINGS ON THE PURPOSE AND EFFECT
   OF THE SUSPENSION AGREEMENT ...........................................................3

STATEMENT OF THE CASE..........................................................................3

STATEMENT OF FACTS.................................................................................5

SUMMARY OF THE ARGUMENT ...............................................................15

ARGUMENT ....................................................................................................16

STANDARD OF REVIEW ..............................................................................16

   A.   COURT OF INTERNATIONAL TRADE IS OBLIGED TO FOLLOW THE
   LAW OF THE CASE AS STATED BY THE FEDERAL CIRCUIT ...................17

   B.   THE 2005 PANEL EXPLICITLY CORRECTED AN ERROR IN LAW
   MADE BY THE TRIAL COURT ...................................................................19

      1.   *The CIT Explicitly Found That the Suspension Agreement Was Not
      Designed to Eliminate Dumping in Both its Discussion of Commerce's
      Determination of Dumping Margins and its Discussion of Critical
      Circumstances .................................................................................19*

*2.   This Court's Decision in Zhejiang III Directly Considered This Interpretation of the Law by the CIT and Found That the CIT Had Erred.......21*

C.   THE CIT WAS OBLIGATED TO COMPLY WITH THE LAW OF THE CASE ESTABLISHED BY *ZHEJIANG III* AND CONDUCT FURTHER PROCEEDINGS IN ACCORDANCE WITH ALL HOLDINGS IN THAT OPINION .......................................................................................................24

D.   THE PROCEEDINGS AFTER *ZHEJIANG III* CLEARLY SHOW THAT THE CIT DECLINED TO FOLLOW THE CAFC'S INTERPRETATION OF § 1673C .........................................................................................................26

E.   THIS COURT SHOULD NOW TAKE APPROPRIATE ACTIONS TO ENSURE THAT THE CIT PROPERLY APPLIES THE LAW OF THE CASE .29

**CONCLUSION..............................................................................................33**

# TABLE OF AUTHORITIES

## Cases

*Ad-vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*,
   943 F.2d 1511 (11th Cir. 1991) ..........................................16

*Am. Hotel Int'l Group v. OneBeacon Ins. Co.*,
   374 Fed. Appx. 71 (2d Cir. 2010)....................................18, 29

*Bankers Trust Co. v. Bethlehem Steel Corp.*,
   761 F.2d 943 (3d Cir. 1985) ..........................................24-25

*Burton v. Johnson*,
   975 F.2d 690 (10th Cir. 1992) ..........................................16

*Caldwell v. Puget Sound Elec. Apprenticeship & Training Trust*,
   824 F.2d 765 (9th Cir. 1987) ..........................................16

*Cardiac Pacemakers v. St. Jude Med., Inc.*,
   576 F.3d 1348 (Fed. Cir. 2009) ..........................................17

*Cf. Fag Italia S.P.A. v. United States*,
   291 F.3d 806 (Fed. Cir. 2002) ..........................................31

*Cherokee Nation v. State of Oklahoma*,
   461 F.2d 674 (10th Cir. 1972) ..........................................25

*Christianson v. Colt Indus. Operating Corp.*,
   486 U.S. 800 (1988)..........................................18

*Clark v. United States*,
   656 F.3d 1317 (Fed. Cir. 2011) ..........................................17

*Cooper Distrib. Co. v. Amana Refrigeration, Inc.*,
   180 F.3d 542 (3d Cir. 1999) ..........................................24

*Designing Health, Inc. v. Erasmus*,
   226 Fed. Appx. 976 (Fed. Cir. 2007)..........................................26, 29

*Donohoe v. Consolidated Operating & Prod. Corp.,*
    30 F.3d 907 (7th Cir. 1994) ...............................................................26

*FCC v. Pottsville Broadcasting Co.,*
    309 U.S. 134 (1940)..........................................................................17

*Gindes v. United States,*
    740 F.2d 947 (Fed. Cir. 1984) ...........................................................30

*Gould, Inc. v. United States,*
    67 F.3d 925 (Fed. Cir. 1995) .............................................................30

*In re Roberts,*
    846 F.2d 1360 (Fed. Cir. 1988) .........................................................17

*Ins. Group Cmte. v. Denver & Rio Grande W. R.R. Co.,*
    329 U.S. 607 (1947)...........................................................................17

*Laitram Corp. v. NEC Corp.,*
    115 F.3d 947 (Fed Cir. 1997) ......................................................16, 18

*Piambino v. Bailey,*
    757 F.2d 1112 (11th Cir. 1985) .........................................................18

*Southern California Edison Co. v. Federal Energy Regulatory Commission,*
    195 F.3d 17 (D.C. Cir. 1999)..............................................................31

*United States v. Morton,*
    467 U.S. 822 (1984)...............................................................11-12, 31

*Zhejiang Native Produce & Animal By-Products Import and Export Corp. v.*
    *United States,* 27 CIT 1827 (2003).............................................*passim*

*Zhejiang Native Produce & Animal By-Products Import and Export Corp. v.*
    *United States,* 28 CIT 1427 (2004)....................................................10

*Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United*
    *States,* 432 F.3d 1363 (Fed. Cir. 2005).......................................*passim*

*Zhejiang Native Produce & Animal By-Products Import and Export Corp. v. United States*, 30 CIT 725, (2006)...................................................13, 27

*Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States,* 2006 U.S. App. LEXIS 4544 (Fed. Cir. 2006).........................................12

*Zhejiang Native Produce & Animal By-Products Import and Export Corp. v. United States*, 339 Fed. Appx. 992 (2013) ..........................................4, 14

*Zhejiang Native Produce & Animal By-Products Import and Export Corp. v. United States*, 37 CIT __, 2013 Ct. Intl. Trade LEXIS 75 ................................15

## Statutes & Regulations

19 U.S.C. § 1673c ...............................................................................*passim*

19 U.S.C. § 1673c(l) ......................................................................10, 31

19 U.S.C. § 1673c(l)(2) ..........................................................................6

19 U.S.C. § 1673c(b) ...............................................................11, 25, 32-33

19 U.S.C. § 1673c(c) ..............................................................................32

19 U.S.C. § 1673c(f)(2)(A) .................................................................5, 32

19 U.S.C. § 1673c(i) ................................................................................6

19 U.S.C. § 1673d(a)(3) ..........................................................................8

28 U.S.C. § 1295(a)(5)..............................................................................2

## Administrative Decisions

*Final Results of Five-Year ("Sunset") Review, Termination of Suspended Antidumping Investigation on Honey From the People's Republic of China*, 65 Fed. Reg. 46,426 (July 28, 2000).........................................................6

*Honey From the People's Republic of China; Suspension of Investigation*, 60 Fed. Reg. 42,521 (August 16, 1995)..........................................................5, 7, 11

*Initiation of Antidumping Duty Investigations: Honey From Argentina and the People's Republic of China*, 65 Fed. Reg. 65831 (November 2, 2000) ...............6-7

*Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Honey From The People's Republic of China*, 66 Fed. Reg. 63670 (December 10, 2001)...............................................................8

*Preliminary Determination of Sales at Less Than Fair Value: Honey From the People's Republic of China*, 66 Fed. Reg. 24101 (May 11, 2001).......................7

## **Others**

Fed. R. App. P. 4(a)(1)(B) ........................................................................2

18-134 Moore's Federal Practice, § 134.23[1][a] (Matthew Bender 3d Ed.) .........17

# STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of the U.S. Court of Appeals for the Federal Circuit, counsel for plaintiffs-appellants, Zhejiang Native Produce & Animal By-Products Import & Export Corp., et al., ("Zhejiang") states the following:

## 1.    Appeal in or from the same Civil Action previously before this Court

First Appeal

Title and number: *Zhejiang Native Produce & Animal By-Products Import & Export Corp., et al. v United States*, Appeal No. 05-1058

Date of decision:   December 20, 2005; rehearing denied February 14, 2006

Composition of the Panel:      Judges Newman, Archer and Rader

Citation of Opinion in Federal Reporter:    432 F.3d 1363, rehearing denied 2006 U.S. App. LEXIS 4544

Second Appeal

Title and number: *Zhejiang Native Produce & Animal By-Products Import & Export Corp., et al. v United States*, Appeal No. 08-1106

Date of decision:   July 23, 2009

Composition of the Panel:      Judges Newman, Bryson and Linn

Citation of Opinion in Federal Reporter:    339 Fed. Appx. 992 (Unpublished in Federal Reporter)

**2.    Cases known to counsel to be pending in this or any other court that will directly affect or will be directly affected by this court's decision in the pending appeal**

There are two cases currently pending in the U.S. Court of International Trade ("CIT") contesting the U.S. Department of Commerce's administration of the antidumping duty order on honey from China which have been stayed pending the outcome of this litigation (CIT Ct. Nos. 02-00064, 04-00268). These cases will not be immediately affected by a decision of this Court upholding Zhejiang's position in this appeal, because the relief appellants seek is a remand order with instructions to comply with this court's previous opinion.

## JURISDICTION

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(5). The CIT's final decision sustaining the remand results of the U.S. Department of Commerce ("Department" or "Commerce"), from which this appeal was taken, was entered on June 18, 2013. JA 22–50. In accordance with Fed. R. App. P. 4(a)(1)(B), Zhejiang filed its Notice of Appeal on August 20, 2013, within 60 days of entry of the CIT Order.

## ISSUES PRESENTED FOR REVIEW

A.     **Whether the CIT Was Obligated To Treat This Court's Legal Rulings From Previous Stages of This Litigation as Law of the Case**

It was. In *Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 432 F.3d 1363 (Fed. Cir. 2005) ("*Zhejiang III*") this Court made unambiguous legal determinations which the CIT declined to recognize on remand. That refusal was a violation of the doctrine of law of the case and is grounds for further proceedings to correct this error.

B.     **Whether the Department Should Be Required To Conduct Further Proceedings In Light of This Court's Rulings On The Purpose and Effect of the Suspension Agreement**

It should.  The CIT should be instructed to remand this case to the Department for a redetermination consistent with all of the legal rulings this Court made in *Zhejiang III*.  Specifically, the Department should conduct further proceedings consistent with this Court's ruling that the Suspension Agreement "was designed to eliminate dumping" and that "prices in compliance with the Suspension Agreement were required to be at a level that would eliminate sales at less than fair value." *Id.* at 1367.

## STATEMENT OF THE CASE

This appeal is taken from the U.S. Court of International Trade's final decision in *Zhejiang Native Produce & Animal By-Products Import & Export*

*Corp., et al. v United States*, USCIT Court No. 02-00057.  In that case, respondents challenged the U.S. Department of Commerce's final affirmative less than fair value determination ("LTFV determination") in an antidumping duty investigation involving honey from the People's Republic of China.  The challenged AD Order was published at 66 Fed. Reg. 63670 (December 10, 2001).

This is the third appeal made in connection with the underlying CIT case.  In 2004 (Fed. Cir. case 2005-1058), appellants, Zhejiang *et al.*, challenged the CIT's decision sustaining Commerce's affirmative LTFV determination, which resulted in *Zhejiang III*, a 2005 decision by this Court reversing the CIT and remanding for further proceedings.  In 2007 (Fed. Cir. case 2008-1106), Zhejiang appealed the CIT's denial of a Rule 60(b) motion; this court dismissed that case as an impermissible interlocutory appeal.[1]  The case then continued at the CIT through three remands on an issue no longer in dispute, until a final opinion sustaining Commerce's remand results was issued in June, 2013.

---

[1] *Zhejiang Native Produce & Animal By-Products Import and Export Corp. v. United States*, 339 Fed. Appx. 992 (2013).  JA 420–423.

## STATEMENT OF FACTS

In 1995, the governments of the United States and the People's Republic of China ("PRC" or "China") entered into an agreement to suspend an antidumping duty investigation that had been initiated in 1994 on Chinese honey ("Agreement" or "Suspension Agreement"). *See Honey From the People's Republic of China; Suspension of Investigation*, 60 Fed. Reg. 42,521 (August 16, 1995). JA 51–57.

The Agreement restricted both the volume of Chinese honey imports and the price at which such imports could be sold to the U.S. Importable Chinese honey could not be sold below a reference price issued quarterly by the Department (the reference price was to be equal to 92% of the weight average price for all honey importations from other countries over the preceding six months). *Id.* at 42,524. JA 54. The Agreement also provided that pursuant to Section 734(f)(2)(A) of the Act (19 U.S.C. § 1673c(f)(2)(A)), the suspension of liquidation of entries of subject honey pursuant to Commerce's preliminary dumping determination in the 1994 AD investigation would be terminated and all estimated dumping duty deposits would be refunded. *Id.* at 42,522. JA 52. The Agreement stipulated that it would remain in effect until August 1, 2000. *Id.* at 42,526. JA 56.

In addition, the Agreement provided that the Government of the PRC and the Department would inform each other of any violations of the Agreement which came to its attention and the action taken with respect to such violations. *Id.*

Pursuant to Section 734(l)(2), Tariff Act of 1930, as amended ("Tariff Act"), if the Department determined that the Agreement "no longer prevents the suppression or undercutting of domestic prices of merchandise manufactured in the United States," the Department was authorized to again suspend liquidation of entries and resume the suspended investigation, pursuant to Section 734(i), Tariff Act, 19 U.S.C. § 1673c(i). 19 U.S.C. § 1673c(l)(2). There were no reported violations of the Agreement from 1995 through 2000, so the Department did not exercise its authority to suspend liquidation or resume the 1994 investigation.

In July 2000, domestic honey producers ("Petitioners") elected not to participate in the Department's Sunset Review of the suspended antidumping duty investigation, which led to the termination of the underlying investigation as well as the Suspension Agreement. *Final Results of Five-Year ("Sunset") Review, Termination of Suspended Antidumping Investigation on Honey From the People's Republic of China*, 65 Fed. Reg. 46,426 (July 28, 2000). JA 60–61.

One month later, on September 29, 2000, the Petitioners filed a new petition requesting that the Department and the Commission initiate a new AD investigation with respect to honey from China. *Initiation of Antidumping Duty Investigations: Honey From Argentina and the People's Republic of China*, 65 Fed. Reg. 65831 (November 2, 2000). JA 62–69. On October 26, 2000, Commerce obliged this request. *Id.*

The scope of the merchandise covered by this second dumping investigation was identical to the scope of the products subject to the Agreement. (*Compare* scope of suspension agreement, JA 52, *with* scope of the new investigation from Initiation Notice , JA 62–63.) The period of investigation for the new antidumping investigation against China was January 1, 2000 through June 30, 2000. Thus, all sales of subject merchandise considered by the Department in this dumping investigation were also sales of honey subject to the volume and price restrictions established by the Suspension Agreement.

In its Preliminary Determination in the 2000 investigation, the Department found that Chinese exporters were dumping honey during the Period of Investigation and that critical circumstances also existed. *See Preliminary Determination of Sales at Less Than Fair Value: Honey From the People's Republic of China*, 66 Fed. Reg. 24101 (May 11, 2001). JA 70–86.

Chinese Respondents (Zhejiang, et al.) argued to the Department that its calculation of the preliminary dumping margins was fundamentally flawed because it failed to take account of the price restrictions imposed by the Agreement. JA 87–88. Respondents asserted that the Chinese honey exporters had complied fully with all the price restrictions established in the Agreement—an assertion disputed by neither the Department nor the Petitioners. Thus, Respondents argued that the Department had unjustly determined that sales during the period of investigation

were sold at "less than fair value" since all sales during that period were made in compliance with price levels *established* by the Department under the Agreement. *Id.*

The Department rejected Respondents' argument and issued a final determination concluding that Chinese honey was being sold at less than fair value. *See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Honey From The People's Republic of China*, 66 Fed. Reg. 63670 (December 10, 2001). JA 125–129. The Department also found, pursuant to Section 735(a)(3), Tariff Act, 19 U.S.C. § 1673d(a)(3), that critical circumstances existed for certain respondents.[2] *Id.* at 63671–63672. JA 126–128. The antidumping duty order on honey from China was published on December 10, 2001. *Id.*

---

[2] The Department makes an affirmative critical circumstances finding, which permits the retroactive application of dumping duties for 90 days prior to the publication of the Preliminary Determination when: (A) (i) there is a history of dumping and material injury by reason of dumped imports in the United States or elsewhere for the subject merchandise, or (ii) the importer knew or should have known the exporter was selling the subject merchandise at less than fair value and that there would be material injury by reason of such sales and (B) there have been massive imports of the subject merchandise over a relatively short period of time. 19 U.S.C. § 1673d(a)(3). In this investigation, the Department imputed knowledge of dumping to certain importers purchasing subject merchandise from exporters with a final margin of 25% or higher under the premise that the importers should have known these purchases were below fair value when the sales was made based on the level of the subsequent dumping margin found. See Issues and Decision Memorandum at Comment 2. JA 100–101.

The Chinese Respondents appealed several aspects of the Department's determination to the Court of International Trade. In a decision dated November 21, 2003 the CIT rejected two of Zhejiang's arguments. *See Zhejiang Native Produce & Animal By-Products Import and Export Corp. v. United States,* 27 CIT 1827 (2003) ("*Zhejiang I*"). JA 179–225.

First, Zhejiang argued that the Suspension Agreement had been an agreement to eliminate dumping, so the Department's failure "to take the reference price into consideration in calculating normal value" warranted remand. Zhejiang reasoned that "Commerce did not determine normal value based on the best available information and thus failed in its duty to calculate margins as accurately as possible." *Id.* at 1837. The CIT disagreed, finding that the "Suspension Agreement was not designed to eliminate the dumping margin," (*Id.* at 1839) and on that basis upholding the LTFV determination under the applicable standard of review. *Id.* at 1841.

Zhejiang also argued that the Department's affirmative critical circumstances determination was fundamentally flawed because it imputed knowledge of dumping to importers of subject honey even though such importers had paid prices in compliance with the terms of the Suspension Agreement. Zhejiang again argued that the Agreement was designed to eliminate dumping, so it was unreasonable for Commerce to find critical circumstances with respect to these compliant sales. The

CIT also rejected this argument. It reasoned that the Suspension Agreement was not relevant to the Department's critical circumstances analysis, since it was not "an agreement to eliminate dumping, but rather an agreement to restrict the volume of imports." *Id.* at 1848 n.34. JA 212.

In *Zhejiang I*, the CIT also remanded for further consideration a third issue raised by Zhejiang regarding the appropriate surrogate value for raw honey.[3] By decision dated August 26, 2004, the CIT sustained the Department's final results on remand with respect to this third issue, entered judgment accordingly, and dismissed the case. *See Zhejiang Native Produce & Animal By-Products Import and Export Corp. v. United States*, 28 CIT 1427 (2004) ("Zhejiang II"). JA 252–269.

On October 25, 2004, Zhejiang filed a timely appeal against the CIT's decision sustaining Commerce's LTFV and critical circumstances determinations. In its direct brief filed with this court, Zhejiang argued that the critical circumstances finding should be reversed for several reasons, including the failure of the Department to consider the impact of the Suspension Agreement in evaluating whether importers should have known that they were purchasing honey at less than fair value prices. *See* Appellant's January 31, 2005 Direct Brief at 48–52. JA 325–329.

---

[3] *Zhejiang I* at 1855. JA 223–224.

By decision dated December 20, 2005, this Court reversed the CIT's ruling in *Zhejiang I*. *Zhejiang Native Produce & Animal By-Products Import and Export Corp. v. United States*, 432 F.3d 1363 (Fed. Cir. 2005) ("*Zhejiang III*"). JA 332 – 341. This court's holding was based in large measure on its analysis of the intended function and legal ramifications of the Suspension Agreement. The opinion contained a detailed analysis discussing the Suspension Agreement's implementation and purpose. *Id.* at 1364–65.

The court noted that, on its face, the Suspension Agreement was executed pursuant to Section 734(l), Tariff Act (19 U.S.C. § 1673c(l)), and that its stated purpose was "encouraging free and fair trade in honey, establishing more normal market relations, and preventing the suppression or undercutting of price levels of the domestic product." *Id.* (*quoting* Suspension Agreement, 60 Fed. Reg. 42,521). But the court also concluded that the Agreement necessarily complied with the criteria set out in 19 U.S.C. § 1673c(b), which authorizes the inclusion of a price restriction in a suspension agreement only "to eliminate completely sales at less than fair value." *Id.* at 1365, 1367 (*quoting* 19 U.S.C. § 1673c(b)). Thus, the court held that "prices in compliance with the Suspension Agreement were required to be at a level that would eliminate sales at less than fair value" and that "[t]he Court of International Trade erred in holding that the Suspension Agreement was not designed to eliminate dumping." *Id.* (*citing United States v. Morton*, 467 U.S. 822,

11

828, 104 S. Ct. 2769, 81 L. Ed. 2d 680 (1984) (parts of statutes are not construed in isolation; a statute is read as a whole)).

Based on this detailed and considered analysis of the purpose and meaning of the Agreement, this Court also concluded that the Department erred in imputing knowledge of dumping to importers of merchandise subject to the Agreement. In all, the court reversed the decision of the CIT and remanded the case "for appropriate further proceedings." *Id* at 1368. JA 341.

Recognizing the broad implications of this Court's decision in *Zhejiang III*, the Government requested a rehearing. In its Petition, the Government's primary claim of "Points Misapprehended or Otherwise Overlooked by the Court" contained the following assertion:

> Contrary to the finding of the Court, the suspension agreement in this case was not, pursuant to the statute, required to, intended to, and in fact did not, eliminate sales at less than fair value.

Petition for Rehearing by Defendant-Appellee United States, CAFC Appeal No. 05-1058 (February 1, 2006) at 2. JA 346. By order dated February 14, 2006, rehearing was denied. *Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States,* 2006 U.S. App. LEXIS 4544 (Fed. Cir. 2006). JA 359.

On June 6, 2006, the Court of International Trade ordered that the Department implement the Federal Circuit's decision, and remanded the matter "for further

consideration of its critical circumstances finding, provided that in no event shall Commerce impute to plaintiffs any knowledge prohibited by the CAFC's decision."[4] The CIT offered no instruction in regards to this Court's discussion and interpretation of 19 U.S.C. § 1673c or in regards to this Court's conclusion that prices in compliance with the Suspension Agreement were required to eliminate dumping.  Nor did the CIT instruct Commerce on remand to reconsider its determinations in accordance with this statutory interpretation.  The Department issued its Remand Determination on September 5, 2006, finding that critical circumstances do not exist.  JA 364–375.

On October 27, 2006, recognizing that the CIT and the Department had refused to incorporate the Federal Circuit's holding with regard to the purpose of the Suspension Agreement, Zhejiang filed a Rule 60(b) Motion with the trial court. In that motion, Zhejiang argued that *Zhejiang III* constituted binding precedent and that the Department should be obligated to reconsider its LTFV determination in light of this Court's holding that the purpose of the Suspension Agreement was to eliminate dumping.  JA 376–404.

On September 26, 2007, the CIT denied the Rule 60(b) Motion.  JA 405–419.  First, the CIT found that the decision in *Zhejiang III* was not as far reaching as Zhejiang had suggested.  The Court found that "[t]his holding simply does not

---

[4] *Zhejiang Native Produce & Animal By-Products Import and Export Corp. v. United States*, 30 CIT 725, (2006) ("*Zhejiang IV*").  JA 360–363.

reach the question of whether Zhejiang could be found to be dumping during the POI." *Zhejiang Native Produce & Animal By-Products Imp. and Exp. Corp. v. United States*, No. 02-00057 (Ct. Int'l Tr. Sep. 26, 2007) (order denying Rule 60(b) motion). JA 413. The court also reasoned that plaintiffs were not entitled to relief because they "did not appeal the court's holding that substantial evidence supported a determination that their sales during the POI were made at sales at less than fair value." *Id.* JA 414.

Finally, the CIT expressly disagreed with this Court's interpretation of the statute and its finding regarding the legal requirements of the Suspension Agreement, stating that "**no serious argument can be made that the Suspension Agreement had as its purpose and effect the elimination of sales at less than fair value during the POI**." *Id.* (emphasis added). JA 415.

Zhejiang filed an appeal on November 16, 2007, within 60 days of the CIT's September 26, 2007 decision denying the 60b motion. In an unpublished opinion dated July 23, 2009, this Court dismissed Zhejiang's appeal on the grounds that it lacked jurisdiction to consider this interlocutory appeal.[5] On June 18, 2013, the CIT sustained Commerce's third remand redetermination on the critical circumstances issue, in which Commerce determined that critical circumstances did not exist because U.S. importers lacked the requisite knowledge that sales were

---

[5] *Zhejiang Native Produce & Animal By-Products Import and Export Corp. v. United States*, 339 Fed. Appx. 992 (2013).

being made at less than fair value.[6]  Zhejiang filed the instant appeal within 60 days of the CIT's decision sustaining the third remand and entering final judgment.

## SUMMARY OF THE ARGUMENT

The sales examined by the Department in the AD investigation at issue were all made while the Suspension Agreement was in effect, and they were all made in compliance with the Agreement's price restriction.  According to this Court's ruling in *Zhejiang III*, the Agreement "was designed to eliminate dumping," and "prices in compliance with the Suspension Agreement were required to be at a level that would eliminate sales at less than fair value."  *Id.* at 1367.  Moreover, this Court expressly held that the CIT erred in holding that the Suspension Agreement was not designed to eliminate dumping.  *Id.*

Notwithstanding this Court's explicit holding on the legal effect of the Suspension Agreement (and its statement that the trial court had erred in holding otherwise), on remand the CIT declined to instruct the Department with regards to this holding.  Thus, although eight years have elapsed since this Court decisively ruled on the purpose of the price restrictions in the Suspension Agreement, the Department still has not considered, in the first instance, the effect of this ruling on the LTFV determination which Respondents challenge through this litigation.

---

[6] *Zhejiang Native Produce & Animal By-Products Import and Export Corp. v. United States*, 37 CIT __, 2013 Ct. Intl. Trade LEXIS 75 ("*Zhejiang V*").

The legal issues decided by this Court in *Zhejiang III* constitute law of the case, and the CIT was obligated to comply with those rulings on remand. Appellants respectfully request that this Court instruct the CIT with regards to its obligations pursuant to the law of the case, and remand this case with explicit instructions for the Department to reconsider its LTFV determination in a manner consistent with the holding of *Zhejiang III*.

## ARGUMENT

## STANDARD OF REVIEW

"The interpretation by an appellate court of its own mandate is properly considered a question of law, reviewable de novo." *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 950–51 (Fed Cir. 1997) (*citing Ginett v. Computer Task Group, Inc.*, 11 F.3d 359, 361 (2d Cir. 1993) ("the appellate court retains the power to determine whether the terms of the mandate have been 'scrupulously and fully carried out'" (citation omitted)); *Burton v. Johnson*, 975 F.2d 690, 693 (10th Cir. 1992) ("[appellate] court is vested with the authority to interpret its own mandate"); *Ad-vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 943 F.2d 1511, 1517 (11th Cir. 1991) (no deference shown to trial court interpretation of appellate court mandate); *Caldwell v. Puget Sound Elec. Apprenticeship & Training Trust*, 824 F.2d 765, 767 (9th Cir. 1987) (no deference shown to trial court interpretation of appellate court mandate)).

## A.  COURT OF INTERNATIONAL TRADE IS OBLIGED TO FOLLOW THE LAW OF THE CASE AS STATED BY THE FEDERAL CIRCUIT

The long-recognized doctrine of "law of the case" establishes that when an appellate court rules on a matter of law, that ruling is binding upon the trial court in subsequent stages of litigation.  *See*, *e.g.*, *Ins. Group Cmte. v. Denver & Rio Grande W. R.R. Co.*, 329 U.S. 607, 612 (1947) (an appellate court's rulings, "unless reversed by it or a superior court, bind the lower court.").  Thus, when this Court issues an opinion that decides an issue of law and remands the case to the CIT for further proceedings, that legal determination becomes law of the case on remand.  *See* 18-134 Moore's Federal Practice, § 134.23[1][a] (Matthew Bender 3d Ed.).  This application of the doctrine of law of the case is commonly known as the mandate rule.  *Cardiac Pacemakers v. St. Jude Med., Inc.*, 576 F.3d 1348, 1356 (Fed. Cir. 2009); *See also Clark v. United States*, 656 F.3d 1317, 1320–21 (Fed. Cir. 2011) ("The mandate rule provides that those issues actually decided on appeal . . . are foreclosed from further consideration.").

Whereas a trial court possesses some discretion to reconsider its own rulings, the "compulsory nature of the Mandate Rule" means that the trial court is "without choice in obeying the mandate of the appellate court." *In re Roberts*, 846 F.2d 1360, 1363 (Fed. Cir. 1988); *See also FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 140 (1940) (characterizing as "indisputable" the proposition that "a

lower court is bound to respect the mandate of an appellate tribunal and cannot reconsider questions which the mandate has laid at rest.")  The Supreme Court has noted that a lower court's duty of obedience to the ruling of a superior court is an obligation derived from the need for "finality and efficiency" in the judicial process.  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). Because adherence to the letter and spirit of the mandate is an obligatory, rather than discretionary act, an appellate court "reviews the judgment of the district court *de novo* for compliance with the mandate."  *Am. Hotel Int'l Group v. OneBeacon Ins. Co.*, 374 Fed. Appx. 71, 73–74 (2d Cir. 2010); *see also Laitram Corp.*, 115 F.3d at 950–51.

As discussed below, it is appellants' contention that the CIT failed to comply with its obligation to adhere to the law of the case when it conducted further proceedings pursuant to this Court's decision in *Zhejiang III.*  Specifically, the trial court failed to acknowledge that this Court had expressly reversed the CIT's holding that the purpose of the Suspension Agreement was not to eliminate dumping, and the CIT failed to take steps to remedy this error in further proceedings as required by the law of the case.  *See Piambino v. Bailey*, 757 F.2d 1112, 1119 (11th Cir. 1985) ("The trial court must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion, and the circumstances it embraces." (internal quotations omitted)).

**B.      THE 2005 PANEL EXPLICITLY CORRECTED AN ERROR IN LAW MADE BY THE TRIAL COURT**

As discussed in the Statement of Facts, above, *Zhejiang I* included an explicit interpretation by the CIT of the statutory provisions of 19 U.S.C. § 1673c as they relate to the Suspension Agreement.  In *Zhejiang III*, this Court made an equally explicit finding that prices in compliance with the Suspension Agreement were required to eliminate sales at less than fair value—a holding plainly contrary to the CIT's initial decision.

**1.      The CIT Explicitly Found That the Suspension Agreement Was Not Designed to Eliminate Dumping in Both its Discussion of Commerce's Determination of Dumping Margins and its Discussion of Critical Circumstances**

*Zhejiang I* contains a detailed rejection of plaintiffs' argument that the Suspension Agreement was required to establish prices that were at or above fair value.  The first discussion of the trial court's position on this issue appears in response to plaintiffs' argument that Commerce was obligated to take into consideration the fact that all export sales were in compliance with the prices established by the Suspension Agreement when determining whether these sales were dumped.  The CIT roundly rejected this position, holding that the relevant statutory provisions did not require the prices set by the Suspension Agreement to be above fair value:

19

The court does not agree with Plaintiffs' argument that Commerce erred by finding Plaintiffs' U.S. sales were made at less than fair value where those sales were made in compliance with the Suspension Agreement. First, nothing in the statutes or regulations that guide Commerce's antidumping determination in the NME context requires (or for that matter permits) Commerce to consider the terms of a suspension agreement. *See* 19 U.S.C. §§ 1677b(c), 1677a(a); 19 C.F.R. § 351.408(a). Second, contrary to Plaintiffs' contention, the inclusion of the reference price does not require the court to find that the Suspension Agreement was entered into pursuant to 19 U.S.C. § 1673c(b). 19 U.S.C. § 1673c(*l*) authorizes Commerce to enter into suspension agreements that restrict the volume of imports with NME countries, subsection (*l*) does not provide any guidance with respect to how volume restriction is to be achieved, the terms that may or may not be included in an agreement to restrict the volume of imports, or the permissible means by which prevention of the "suppression or undercutting of price levels of domestic products by imports" might be realized.[7]

Later within the same opinion, while addressing plaintiffs' argument that Commerce's critical circumstances finding was in error for failing to consider that all sales were made in compliance with the prices established through the Suspension Agreement, the trial court again reiterated that the Suspension Agreement was not designed to eliminate dumping:

The existence of the Suspension Agreement does not compel a different finding. As discussed *supra*, the Suspension Agreement was not an agreement to eliminate dumping, but rather an agreement to restrict the volume of imports. As such, Plaintiffs' argument that the existence of the Suspension Agreement detracts from the reasonableness of Commerce's

---

[7] *Zhejiang I*, 27 CIT at 1838. JA 197–198.

20

determination that the importers here knew or should have known of dumping is misplaced.[8]

Accordingly, the CIT in *Zhejiang I* addressed the implications of the Suspension Agreement on Commerce's LTFV determination in response to two separate issues, and in both instances the court explicitly held that the Suspension Agreement was not intended to eliminate dumping and that Respondents' compliance with the Suspension Agreement pricing restrictions did not require Commerce's dumping determination to be revisited.

## 2. This Court's Decision in *Zhejiang III* Directly Considered This Interpretation of the Law by the CIT and Found That the CIT Had Erred.

An integral part of this Court's decision in *Zhejiang III* was an analysis of the parties' arguments regarding the impact of the Suspension Agreement upon Commerce's findings and an analysis of the statutory provisions in 19 U.S.C. § 1673c that govern suspension agreements. This analysis is contained in the following excerpt from *Zhejiang III*:

> The respondents had argued that they should not be found to be dumping because their prices were in compliance with those set under the Suspension Agreement. They pointed out that the Suspension Agreement was in effect during the Period of Investigation of surrogate data for India. However, the court held that Commerce was not required to consider the price and volume terms or even the existence of the Suspension Agreement, stating that "the Suspension Agreement was not an agreement to eliminate dumping, but rather an agreement to

---

[8] *Id*. at 1848, n.34. JA 212.

restrict the volume of imports." *Zhejiang*, 25 ITRD (BNA) at 2409 n.34. The court held that it was not relevant whether the import price met the 92% reference price as applied during the period of the Suspension Agreement, and concluded that compliance with the reference price did not mean that dumping was avoided. …

Zhejiang states that the purpose and effect of the Suspension Agreement was to set "completely" a non-dumping price for Chinese honey, *see* 19 U.S.C. § 1673c(b), and that the importers should not be charged with imputed knowledge that the China prices would be found to be below fair value when compared with later-determined costs and prices in India. …

Zhejiang points out that the Suspension Agreement was designed to eliminate dumping, and disputes the government's position and the court's holding that the purpose of such agreements is not to prevent sales at less than fair value. The government cites a subsection of the statute that refers to suspension agreements with a nonmarket economy:

> 19 U.S.C. § 1673c(l)(1). The administering authority may suspend an investigation under this part upon acceptance of an agreement with a nonmarket economy country to restrict the volume of imports into the United States of the merchandise under investigation only if the administering authority determines that --
>
> (A) such agreement satisfies the requirements of subsection (d) of this section, and
>
> (B) will prevent the suppression or undercutting of price levels of domestic products by imports of the merchandise under investigation.

This subsection, recognizing that value levels may not be comparable for a nonmarket economy, requires that a suspension agreement that restricts the volume of imports will not be entered unless the restriction will prevent suppression or undercutting of domestic prices. **However, the statute does not**

> mean or imply that dumping prices are intended to be
> acceptable, for § 1673c(b) mandates that such agreements
> will "eliminate completely sales at less than fair value."
>
> The government does not argue that the Suspension Agreement
> failed to comply with the statute. Rather, the government argues
> that Zhejiang was properly imputed with knowledge that prices
> that conformed with the Agreement were dumping prices. That
> position is negated by the statute itself, **for the prices in
> compliance with the Suspension Agreement were required to
> be at a level that would eliminate sales at less than fair value.
> See United States v. Morton, 467 U.S. 822, 828, 104 S. Ct.
> 2769, 81 L. Ed. 2d 680 (1984) (parts of statutes are not
> construed in isolation; a statute is read as a whole). The
> Court of International Trade erred in holding that the
> Suspension Agreement was not designed to eliminate
> dumping.**[9]

The quoted excerpts from *Zhejiang III* establish a number of important points.

First, these excerpts confirm that this Court recognized the trial court had

specifically held that "the Suspension Agreement was not an agreement to

eliminate dumping." *Zhejiang III*, 432 F.3d at 1366–67.  Then, the opinion plainly

shows that this Court undertook a detailed analysis of the related provisions of 19

U.S.C. § 1673c and reached the contrary conclusion, finding that "prices in

compliance with the Suspension Agreement were required to be at a level that

would eliminate sales at less than fair value." *Id.*

Finally, the opinion unequivocally states that "[t]he Court of International Trade

erred in holding that the Suspension Agreement was not designed to eliminate

---

[9] *Zhejiang III*, 432 F.3d at 1366–67(emphasis added).

dumping." *Id.* This declaration, in particular, should have removed any doubt that the appellate court had conducted its own analysis of the statute and had reached an interpretation of the statute that was contrary to the holding of the trial court.

Given these very clear statements expressed by this Court in *Zhejiang III* in reaction to the CIT's initial holding, there can be no doubt that the CIT was obligated under the law of the case doctrine to adhere to this Court's interpretation of 19 U.S.C. § 1673c and to conduct further proceedings in accordance with this Court's plainly stated view that prices in compliance with the Suspension Agreement were <u>required</u> to be at a level that would eliminate dumping. *See, e.g.*, *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 180 F.3d 542, 546 (3d Cir. 1999) (stating that it is "axiomatic that on remand after an appellate court decision, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal") (internal quotations omitted).

## C.    **THE CIT WAS OBLIGATED TO COMPLY WITH THE LAW OF THE CASE ESTABLISHED BY *ZHEJIANG III* AND CONDUCT FURTHER PROCEEDINGS IN ACCORDANCE WITH ALL HOLDINGS IN THAT OPINION**

This Court's order in *Zhejiang III* that the case be "remanded for appropriate further proceedings," can only be understood in light of the legal determinations made in that opinion. *Zhejiang III*, 432 F.3d at 1368; *see also Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir. 1985) ("Where the reviewing court in its mandate prescribes that the court shall proceed in accordance with the

opinion of the reviewing court, such pronouncement operates to make the opinion a part of the mandate as completely as though the opinion had been set out at length."), *Cherokee Nation v. State of Oklahoma*, 461 F.2d 674, 678 (10th Cir. 1972) ("The opinion of the court may be consulted to ascertain the intent of the mandate.").

Surely, further proceedings before the CIT and Commerce could not qualify as "appropriate" if the erroneous legal determination of the CIT (identified and corrected by this Court) was allowed to remain undisturbed.  In accordance with the obligations imposed by the mandate rule and the fundamental principles of administrative law, the CIT bore a responsibility to correct the legal error identified by the Court of Appeals, and to issue appropriate remand instructions of its own to the Department of Commerce. *Bankers Trust Co.,* 761 F.2d at 950 (stating that "upon a reversal and remand for further consistent proceedings, the case goes back to the trial court and there stands for a new determination of the issues presented as though they had not been determined before, pursuant to the principles of law enunciated in the appellate opinion, which must be taken as the law of the case").

Specifically, the CIT should have instructed Commerce to conduct further proceedings on remand in accordance with this Court's holding  that the purpose of the Suspension Agreement was to avoid dumping, and that, according to 19 U.S.C. § 1673c(b), any subject merchandise sold at prices in compliance with the

Suspension Agreement, could not, as a matter of law, have been dumped. *Zhejiang III* at 1367.

**D.**      **THE PROCEEDINGS AFTER *ZHEJIANG III* CLEARLY SHOW THAT THE CIT DECLINED TO FOLLOW THE CAFC'S INTERPRETATION OF § 1673c**

When a trial court disagrees with a mandate from the appellate court, the appropriate course of action in a "hierarchical judiciary" is for the trial court to "signal its disagreement, but carry out the mandate." *Donohoe v. Consolidated Operating & Prod. Corp.*, 30 F.3d 907, 910 (7th Cir. 1994). In other words, a trial court judge "who thinks new evidence or better argument refutes one of [the appellate court's] decisions should report his conclusions while applying the existing law of the circuit." *Id.* (internal quotation omitted). However, it is <u>not</u> within the discretion of the trial court to disregard the holding of the appellate court since the trial court's duty of obedience to the law of the case is rigid. *Designing Health, Inc. v. Erasmus*, 226 Fed. Appx. 976, 980 (Fed. Cir. 2007) ("a lower court . . . cannot reconsider questions which the mandate has laid to rest." (*quoting Pottsville*, 309 U.S. at 140–41)). Notwithstanding this well-settled legal principle, the record demonstrates that the CIT in its further proceedings after *Zhejiang III* did not accept the contrary legal holding of this Court and take actions to correct its earlier interpretations of the Suspension Agreement that were found erroneous.

After this Court's decision in *Zhejiang III*, the CIT remanded the case to the

Department "for further consideration of its critical circumstances finding,

provided that in no event shall Commerce impute to plaintiffs any knowledge

prohibited by the CAFC's decision." *Zhejiang Native Produce & Animal By-*

*Product Import & Export Corp. v. United States* 30 CIT 725 (2006) ("*Zhejiang*

*IV*").  The CIT's remand made no mention of this court's discussion and analysis

of section 1673c, this Court's holding that prices in compliance with the

Suspension Agreement were required to eliminate dumping, or this court's explicit

statement that the CIT had *erred* in holding that the Suspension Agreement was not

required to eliminate dumping.  Consequently, the Department was given no

instructions to address any issues related to these findings on remand.

While these omissions from the CIT's remand instructions are a strong

indication that the CIT was not complying with its obligation under the mandate

rule to accept the law of the case as determined by this court, far more explicit

proof of this refusal became evident in subsequent proceedings.  After the first

remand redetermination had been filed by Commerce with the CIT with no further

discussion of the legal implication of the Suspension Agreement upon the

underlying dumping determination, plaintiffs filed a motion pursuant to Rule 60(b)

alleging that the Federal Circuit's holding with respect to the Suspension

Agreement obligated the CIT to instruct Commerce to reconsider its underlying

dumping determination.  JA 376–404.

The CIT, after due deliberation, denied plaintiffs' 60(b) motion in a 15-page

order on September 26, 2007.  This order rejected plaintiffs' position that the

Federal Circuit's decision in *Zhejiang III* constituted a change to the controlling

law for the case with respect to the impact of the Suspension Agreement on the

determination of dumping.  The CIT denied that the Federal Circuit had even

addressed the issue in *Zhejiang III*, stating that "the Federal Circuit's holding does

not mention dumping."  JA 412.  Beyond this denial, the trial court went on to

reiterate in even stronger language than its holding in *Zhejiang I* that the

Suspension Agreement was not relevant to the underlying dumping determination

by Commerce:

> Finally, **no serious argument can be made that the Suspension
> Agreement had as its purpose and effect the elimination of sales at
> less than fair value** during the POI.  While all suspension agreements
> are authorized by 19 U.S.C. § 1673c, they do not all seek to provide
> the same relief to U.S. domestic industries. … subsection (l) provides
> for a "special rule for nonmarket economy countries" under which
> Commerce may enter into an agreement to restrict the volume of
> imports into the United States if Commerce finds that the agreement
> "will prevent the undercutting or  suppression of price levels of
> domestic products by imports of the merchandise under
> investigation."  19 U.S.C. § 1673c(l)(1).  **Agreements entered into
> under subsection (l) have as their purpose the prevention of
> undercutting or price suppression – not dumping.**  Price
> suppression and sales at less than fair value are just not the same
> thing.

(emphasis added). JA 415–417.

Thus, the proceedings in this case after *Zhejiang III* demonstrate that the trial court expressly disregarded this Court's holding that prices in compliance with the Suspension Agreement were required to eliminate dumping (and this Court's clear statement that the trial court had erred in holding otherwise) and that the trial court has refused to avail itself of opportunities to take corrective actions. The trial court's refusal to acknowledge the error in its prior holding, and its refusal to order further proceedings to correct this error, is directly at odds with its obligation under the law of the case doctrine. *See, e.g., Designing Health*, 226 Fed. Appx. at 980.

**E. THIS COURT SHOULD NOW TAKE APPROPRIATE ACTIONS TO ENSURE THAT THE CIT PROPERLY APPLIES THE LAW OF THE CASE**

In light of the facts discussed above, we respectfully request that this Court remand this case with explicit instructions for the Court of International Trade to comply with the law of the case in this appeal as established by this Court in *Zhejiang III*. *See*, *e.g., Am. Hotel Int'l Group v. OneBeacon Ins. Co.*, 374 Fed. Appx. 71, 73–74 (2d Cir. 2010) (noting that an appellate court "retains the authority to determine whether the terms of [its] mandate have been scrupulously and fully carried out," and has the "right to control the actions of the district court where the mandate has been misconstrued or has not been given full effect") (internal quotations omitted). It is unquestionably beyond the discretion of the trial

court to reconsider an issue of statutory construction once it has been resolved by this Court, much less to conclude that "no serious argument can be made" for the interpretation of the statute espoused by the appellate court.

The law of the case doctrine also advises that a court should not revisit its own reasoned legal determinations in subsequent stages of the same litigation. *Christianson*, 486 U.S. at 816. This Court has ruled that it will adhere to its decisions in prior appeals in the same case, "unless one of three exceptional circumstances exist: (1) the evidence in a subsequent trial is substantially different; (2) controlling authority has since made a contrary decision of law applicable to the issues; or (3) the earlier ruling was clearly erroneous and would work a manifest injustice." *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed. Cir. 1995) (*citing Gindes v. United States*, 740 F.2d 947, 950 (Fed. Cir. 1984)). In this case, as there has been neither subsequent trial nor a contrary legal decision by controlling authority, the first two exceptions plainly do not apply. Moreover, the court's prior determination was *correct*, not clearly erroneous, and has therefore worked no injustice, manifest or otherwise.

As discussed above, the Suspension Agreement restricted both the volume of Chinese honey imports and the price at which permitted Chinese honey imports could be sold. The Department's authority to enter into suspension agreements is governed by the comprehensive statutory scheme found in Section 734, Tariff Act

of 1930, as amended ("the Act"), 19 U.S.C. § 1673c. As recognized by this Court, the statutory provision referenced by Commerce as the authority for the Honey Suspension Agreement (19 U.S.C. § 1673c(l); Section 734(l)), only authorizes volume restrictions. *See Zhejiang III,* 432 F.3d at 1367. Thus, a suspension agreement that goes beyond a quantitative restriction, by also imposing price restrictions, must draw its authority from another subsection of Section 734 and must comply with the requirements of that provision.[10]

Rather than conclude that the Suspension Agreement had been unlawfully executed (by including terms without statutory authorization), this Court found that the price restriction was authorized by another portion of the statute, even if not explicitly invoked. In so doing, the court noted that that the government had not argued "that the Suspension Agreement failed to comply with the statute." *Zhejiang III* at 1367. Instead, citing *United States v. Morton*, 467 U.S. 822, 828 (1984), the court embraced the cannon of construction that statutes should be read as a whole. Price restrictions in suspension agreements are only authorized by

---

[10] *Cf. Fag Italia S.P.A. v. United States*, 291 F.3d 806, 817 (Fed. Cir. 2002) (rejecting the argument that the authority Congress granted Commerce to conduct duty absorption inquiries in certain circumstances permitted the agency to conduct such inquiries in all circumstances unless specifically prohibited by the statute, stating that "{t}he fact that Commerce is empowered to take action in certain limited situations does not mean that Commerce enjoys such power in other instances"); *see also Southern California Edison Co. v. Federal Energy Regulatory Commission*, 195 F.3d 17, 24 (D.C. Cir. 1999) (stating that "{t}he court has repeatedly rejected the notion that the absence of an express proscription allows an agency to ignore a proscription implied by the limiting language of a statute").

§ 1673c(b) or, in certain "extraordinary circumstances" not found here, by § 1673c(c).[11] According to § 1673c(b), pricing restrictions in suspension agreements must "eliminate dumping completely." Thus, there is statutory support for this Court's conclusion that the price restriction was included in the Suspension Agreement to eliminate sales at less than fair value.

Furthermore, the Suspension Agreement authorizes the liquidation of entries suspended under the Antidumping Duty ("ADD") investigation and the refund of any ADD cash deposits made for these suspended entries. *See* 60 Fed. Reg. 42,522. JA 52. The Agreement specifically authorizes these actions pursuant to Section 734(f)(2)(A) of the Act, 19 U.S.C. § 1673c(f)(2)(A). This provision applies only if the suspension agreement "is an agreement described in subsection (b)." *Id*. Thus, the Department only had the authority to liquidate these suspended entries if the Suspension Agreement was promulgated pursuant to subpart (b), and, therefore, was required "to eliminate completely sales at less than fair value." 19

_____

[11] The statute defines "extraordinary circumstances" as circumstances in which (i) the suspension of the investigation will be more beneficial to the industry than continuation of the investigation and (ii) the investigation is complex. "Complex" is then defined as instances in which (i) there are a large number of transactions to be considered, (ii) the issues raised are novel or (iii) the number of firms involved is large. 19 U.S.C. § 1673c(c)(2). Section 1673c(c)(1) requires Commerce to determine that such "extraordinary circumstances" exist before authorizing a price restriction pursuant to this subsection. Since the Suspension Agreement does not contain the requisite determination by Commerce regarding these extraordinary circumstances, the price restrictions within the Agreement could not have been authorized pursuant to § 1673c(c)(1).

U.S.C. § 1673c(b).  The statute does not authorize the liquidation of suspended entries for any other types of agreements.  Id.

Accordingly, there is ample support both on the record and in the statute for this Court's holding in *Zhejiang III* that the prices in compliance with the Suspension Agreement "were required to be at a level that would eliminate sales at less than fair value," and there is no indication that this holding was "clearly erroneous and would work a manifest injustice."

## CONCLUSION

For the reasons discussed above, Zhejiang respectfully requests that this Court remand this case to the CIT with instructions to conduct further proceedings that comply with all of this Court's holdings in *Zhejiang III*.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADTT LLP

*/s/ Bruce M. Mitchell*
Bruce M. Mitchell
Mark E. Pardo
Ned H. Marshak
John M. Foote
Andrew T. Schutz
Counsel for Plaintiffs-Appellants

November 18, 2013
New York, New York

**ATTACHMENT**

**APPEALED CIT SLIP OP. 13-76**

Slip Op. 13-76

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                :
ZHEJIANG NATIVE PRODUCE &       :
ANIMAL BY-PRODUCTS IMPORT &     :
EXPORT CORP., et al.,           :
                                :
            Plaintiffs,         :
                                :
                 v.             :
                                :
UNITED STATES,                  :   Before: Richard K. Eaton, Judge
                                :
            Defendant,          :   Court No. 02-00057
                                :
               and              :
                                :
THE AMERICAN HONEY PRODUCERS    :
ASSOCIATION and THE SIOUX       :
HONEY ASSOCIATION,              :
                                :
        Defendant-Intervenors.  :
_____:
```

**OPINION**

[The United States Department of Commerce's Final Results of Redetermination are sustained.]

Dated: June 18, 2013

_Ned H. Marshak_, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of New York, NY, argued for plaintiffs. With him on the brief were _Bruce M. Mitchell_ and _Mark E. Pardo_.

_Jane C. Dempsey_, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, D.C., argued for defendant. With her on the brief were _Stuart F. Delery_, Acting Assistant Attorney General, _Jeanne E. Davidson_, Director, and _Reginald T. Blades, Jr._, Assistant Director. Of counsel on the brief was _Sapna Sharma_, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, D.C.

_Michael J. Coursey_, Kelley Drye & Warren, LLP, of Washington, D.C., argued for defendant-intervenors. With him on the brief was _R. Alan Luberda_.

Eaton, Judge:  Before the court are the Final Results of Redetermination (ECF Dkt. No. 114) ("Third Remand Results") issued pursuant to the court order in *Zhejiang Native Produce & Animal By-Products Import & Export Corp. v. United States,* 35 CIT __, Slip Op. 11-110 (Sept. 6, 2011) (*Zhejiang V*).  At issue is the Department of Commerce's (the "Department" or "Commerce") "critical circumstances" determination in the investigation of Honey from the People's Republic of China ("PRC") covering the period of investigation ("POI") January 1, 2000 through June 30, 2000.  Honey From the PRC, 66 Fed. Reg. 50,608, 50,610 (Dep't of Commerce Oct. 4, 2001) (notice of final determination of sales at less than fair value), *as amended by* Honey From the PRC, 66 Fed. Reg. 63,670 (Dep't of Commerce Dec. 10, 2001) (notice of amended final determination of sales at less than fair value and antidumping duty order) (collectively, the "Final Results").

In *Zhejiang V*, the court directed the Department to "use any analysis permitted by *Zhejiang IV* to complete its critical circumstances review, provided that it not use evidence prohibited by this opinion."  *Zhejiang V*, 35 CIT at __, Slip Op. 11-110, at 24; *see Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 34 CIT __, Slip Op. 10-30 (2010) (*Zhejiang IV*).  In these Third Remand Results, Commerce finds that critical circumstances did *not* exist.  Third Remand Results at 3.

Plaintiffs[1] assert that Commerce's critical circumstances determination is supported by substantial evidence and is in accordance with law, and that Commerce "clearly conformed to

---

[1]       Plaintiffs are Zhejiang Native Produce & Animal By-Products Import & Export Corp., Kunshan Foreign Trade Co., China (Tushu) Super Food Import & Export Corp., High Hope International Group Jiangsu Foodstuffs Import & Export Corp., National Honey Packers & Dealers Association, Alfred L. Wolff, Inc., C.M. Goettsche & Co., China Products North America, Inc., D.F. International (USA) Inc., Evergreen Coyle Group, Inc., Evergreen Produce, Inc., Pure Sweet Honey Farm, Inc., and Sunland International, Inc.

the Court's instructions" in *Zhejiang V*.  Pls.' Resp. to Def.-Ints.' Cmts. Re: Third Remand

Results 2 (ECF Dkt. No. 125) ("Pls.' Reply").

      Defendant-intervenors,[2] however, urge that Commerce's "determination is not supported

by substantial evidence or in accordance with law."  Def.-Ints.' Cmts. to Third Remand Results

1–2 (ECF Dkt. No. 119) (Def.-Ints.' Cmts.").  Therefore, they ask the court to "again remand the

proceeding to Commerce [and] instruct[] the agency to determine, based on the record as [a]

whole and without requiring proof of actual importer knowledge of dumping, whether substantial

evidence supports imputing importer knowledge of dumping for purposes of an affirmative

critical circumstances determination."  Def.-Ints.' Cmts. 3.

      The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and 19 U.S.C. §§

1516a(a)(2)(A)(i)(II) and (B)(i) (2006).  For the reasons set forth below, the Third Remand

Results are sustained.


## **BACKGROUND**

      The facts of this case are fully set forth in the prior decisions in *Zhejiang Native Produce*

*& Animal By-Products Imp. & Exp. Corp. v. United States*, 27 CIT 1827 (2003) (*Zhejiang I*),

*Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 432 F.3d

1363 (Fed. Cir. 2005) (*Zhejiang II*), *Zhejiang IV*, 34 CIT __, Slip Op. 10-30, *Zhejiang V*, 35 CIT

__, Slip Op. 11-110, and the court's Order of September 26, 2007 denying plaintiffs' USCIT

Rule 60(b) motion for relief from judgment, Ct. Order at 14 (Sept. 26, 2007) (ECF Dkt. No. 78)

("Sept. 26 Order").  A brief restatement of the case follows to place this opinion within its

broader context.

_____

      [2]      Defendant-intervenors are The American Honey Producers Association and The
Sioux Honey Association (collectively, "defendant-intervenors").

In 1994, Commerce initiated an unfair trade investigation of honey from the PRC. The investigation was subsequently halted when the Department entered into a suspension agreement with the PRC. Honey From the PRC, 60 Fed. Reg. 42,521 (Dep't of Commerce Aug. 16, 1995) (suspension of investigation) (the "Suspension Agreement"). The Suspension Agreement was in effect from August 16, 1995 through August 16, 2000. Honey From the PRC, 65 Fed. Reg. 46,426 (Dep't of Commerce July 28, 2000) (termination of suspended antidumping duty investigation).

In 2000, following the termination of the Suspension Agreement and at the urging of the domestic industry, Commerce initiated a second investigation. Honey From Argentina & the PRC, 65 Fed. Reg. 65,831 (Dep't of Commerce Nov. 2, 2000) (initiation of antidumping duty investigations) (the "Second Investigation"). During the Second Investigation, the petitioners alleged the existence of "critical circumstances" which, if determined to exist, would result in antidumping duties going into effect ninety days earlier than would be the case in the absence of "critical circumstances." *See* 19 U.S.C. § 1673b(e)(1) (2000); 19 C.F.R. § 351.206 (2002). Generally, Commerce will find the presence of critical circumstances if there is a surge of imports and if the importers know or can be charged with knowing (1) that the product is being dumped, and (2) that there would be material injury as result of the dumped sales. *See* 19 U.S.C. § 1673d(a)(3).

For the Second Investigation, Commerce identified the POI as January 1, 2000 through June 30, 2000, a period during which the Suspension Agreement was still in effect. The Department used this POI to determine (1) if plaintiffs were dumping their merchandise, and (2) if critical circumstances were present. *See* Honey From the PRC, 66 Fed. Reg. 24,101, 24,106

(Dep't of Commerce May 11, 2001) (notice of preliminary determination of sales at less than fair value).

After completing its Second Investigation, Commerce issued an affirmative finding of dumping and an affirmative finding of critical circumstances based on its "twenty-five percent" methodology.  Final Results, 66 Fed. Reg. at 50,608, 63,671.  Under this methodology, the Department considers dumping

> "margins of 25 percent or more for [export price] sales sufficient to impute knowledge of dumping" . . . . In other words, in cases where, as here, export price is calculated by reference to sales made to unaffiliated purchasers in the United States, and Commerce determines that the antidumping duty margin with respect to those sales is 25% or more, Commerce "imputes" knowledge of dumping to the importer

during the period leading up to the investigation. *Zhejiang I*, 27 CIT at 1842–43 (citation omitted).  In the Final Results, Commerce found that "there is evidence of the knowledge of dumping . . . [that was] demonstrated by the fact that [plaintiffs] have dumping margins of over 25 percent."  *Zhejiang I*, 27 CIT at 1843 (internal quotation marks and citation omitted).  Based on this imputation of knowledge, the Department issued an affirmative critical circumstances determination.

Plaintiffs sought judicial review of the Final Results in this court, challenging (1) the Department's "calculation of antidumping duty margins"; (2) Commerce's critical circumstances determination based on the use of its twenty-five percent methodology to impute knowledge of dumping; and (3) "the reliability of certain sources" of surrogate valuation data. *Zhejiang I*, 27 CIT at 1831.  The court held that the Suspension Agreement did not prevent Commerce from using its twenty-five percent methodology and remanded the case on the other questions.  *Id.* at 1849–50, 1855–56 (holding that compliance with a suspension agreement designed to prevent the suppression of prices or price undercutting did not negate the use of Commerce's twenty-five

percent methodology to impute knowledge of dumping in a critical circumstances determination

because dumping and price suppression or undercutting are not the same thing). Consequently,

the court sustained Commerce's affirmative critical circumstances determination. *Id.* at 1851.

After remand, the court sustained the Department's determination that the honey had been

dumped and dismissed the case. *See* Judgment (Aug. 26, 2004) (ECF Dkt. No. 47).

Plaintiffs appealed only the court's critical circumstances holding in *Zhejiang I* to the

Federal Circuit, again arguing that the existence of the Suspension Agreement prevented the

imputation of knowledge of dumping. The Federal Circuit reversed the court's critical

circumstances decision, holding that plaintiffs' compliance with the Suspension Agreement

precluded an imputation of knowledge of dumping using the Department's twenty-five percent

methodology during the POI, and stating

> "[I]t strains credibility to suggest that Commerce could establish minimum prices
> for honey designed to 'prevent the *suppression or undercutting of price levels* of
> the United States honey products' and then determine that U.S. importers
> purchasing honey in accordance with these pricing guidelines should have known
> these sales would be found to be at *less than fair value*" [(i.e., were dumped)].
> When all factors are considered, there is not substantial evidence to support the
> finding of critical circumstances.

*Zhejiang II*, 432 F.3d at 1368 (citation omitted) (emphasis added). Thus, the Court found that, in

the context of a critical circumstances determination, price suppression and price undercutting,

concepts normally associated with International Trade Commission ("ITC") injury

determinations, can play some role in a finding related to knowledge of dumping.[3] The Court

then remanded the case to this court for further proceedings in accordance with its decision. *Id.*

---

[3]         Dumping and sales at less than fair value *are* the same thing because sales at less
than fair value indicate that dumping is occurring. *See* 19 U.S.C. § 1677b(a) (stating that in
order to make an antidumping determination, Commerce must determine "whether subject
merchandise is being, or is likely to be, sold at less than fair value.").

The court further remanded the matter to Commerce for reconsideration of the critical circumstances issue. *Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 30 CIT 725, 725–26 (2006) (*Zhejiang III*). Pursuant to the Federal Circuit ruling, the court instructed Commerce to further consider "its critical circumstances finding, provided that in no event shall Commerce impute to plaintiffs any knowledge prohibited by the [Federal Circuit]'s decision." *Id.*

After the Federal Circuit's decision in *Zhejiang II*, plaintiffs filed a motion for relief from judgment under USCIT Rule 60(b). Pls.' Mot. for Relief from J. (ECF Dkt. No. 69) ("Pls.' Relief Mot."). By their motion, plaintiffs sought to amend the judgment of the court in *Zhejiang I*, arguing that, in light of the Federal Circuit's reversal in *Zhejiang II*, the judgment should be "modified with instructions requiring the Department to recalculate the dumping margins for [plaintiffs] in compliance with the appellate court's finding that sales made in compliance with the terms of the Suspension Agreement were not made at less than fair value and with instructions to amend the Antidumping Duty Order accordingly." Pls.' Relief Mot. 2. In other words, in addition to the remand to the Department relating to Commerce's critical circumstances determination, plaintiffs also "ask[ed] the court to direct Commerce to make the additional finding that their sales made during the [POI] for the Second Investigation were not made at less than fair value [(i.e., dumped)] because of plaintiffs' compliance with the Suspension Agreement. In seeking this relief, plaintiffs hope[d] to eliminate the antidumping duties imposed by the antidumping duty order." Sept. 26 Order at 5 (citation omitted).

In making their case, plaintiffs contended that "the Federal Circuit not only held that the Suspension Agreement precluded the imputation of knowledge of dumping in the context of a critical circumstances finding, but also held 'that sales made in compliance with the terms of the

Suspension Agreement were not made at less than fair value.'" Sept. 26 Order at 6–7 (quoting Pls.' Relief Mot. 2). Thus, for plaintiffs, the logical extension of the Federal Circuit's "suppression or undercutting of price levels" analysis was that they could not have been found to have dumped honey during the POI.

The court denied this motion, stating that plaintiffs' requested relief "would be a considerable expansion of the effect of the Federal Circuit's opinion, as it would wholly eliminate the basis for the antidumping duty order." Sept. 26 Order at 7. The court based its decision on two findings.

First, that the Federal Circuit's holding did "not reach the question of whether plaintiffs could be found to be dumping during the POI[, but] held that a suspension agreement designed to prevent the suppression and undercutting of price levels prevented the imputation of knowledge of dumping to the [plaintiffs]" solely for purposes of finding critical circumstances. Sept. 26 Order at 9; *see also* Sept. 26 Order at 13 ("Price suppression and sales at less than fair value are just not the same thing.").

Second, "plaintiffs [were] not entitled to the relief they seek because they did not appeal the court's holding that substantial evidence supported a determination that their sales during the POI were made at less than fair value." Sept. 26 Order at 10–11 (citation omitted); *see also* Sept. 26 Order at 11 ("[W]hile they pursued the question of the imputation of knowledge with respect to critical circumstances in their appeal, plaintiffs did not appeal this court's holding that substantial evidence supported a finding of dumping during the POI.").

Plaintiffs appealed the denial of this motion to the Federal Circuit. The Federal Circuit dismissed the appeal, finding that it was interlocutory and therefore "simply an effort to obtain review of an issue in a pending trial court proceeding without waiting for the trial court to enter a

final judgment in the case." *Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. Grp. v. United States*, 339 F. App'x 992, 994 (Fed. Cir. 2009).

Following the remand ordered in *Zhejiang III*, Commerce filed its First Remand Results, finding that critical circumstances did *not* exist. Upon review of the First Remand Results, the court remanded once again, explaining that the Federal Circuit's decision in *Zhejiang II* did not prevent the Department from considering analyses other than the twenty-five percent methodology or time periods other than the POI in making its critical circumstances determination. *Zhejiang IV*, 34 CIT at __, Slip Op. 10-30, at 20 ("Commerce has the authority to exercise its discretion to apply any other reasonable method or look to any other reasonable time period in making its critical circumstances determination."). In addition, the court provided examples of other methodologies Commerce might have employed. *Id.* at __, Slip Op. 10-30, at 12 (citation omitted) ("Prior to its adoption of the 25 percent method, Commerce found that, with respect to respondents from non-market economies, it would use a case by case determination 'using all available information and drawing upon market conditions of the industry subject to the investigation' when imputing knowledge of less-than-fair value sales.").

Commerce then filed its Second Remand Results pursuant to *Zhejiang IV*, again using its twenty-five percent methodology, but using as the time period for its analysis the 190-day period between the initiation of the investigation and the issuance of the Preliminary Results. *Zhejiang V*, 35 CIT at __, Slip-Op. 11-110, at 10–11 (citing Results of Redetermination Pursuant to Remand at 62–63 (Dep't of Commerce Dec. 8, 2010) (ECF Dkt. No. 95) ("Second Remand Results")). There, the Department found "that critical circumstances existed for Zhejiang . . . because [based on the twenty-five percent methodology] 'record evidence demonstrates that importers knew or should have known that the exporter was selling the subject merchandise at

less than its fair value.'" *Id.* at __, Slip-Op. 11-110, at 3 (quoting Second Remand Results at 42).

In *Zhejiang V*, the court once again remanded to Commerce, finding "that Commerce's critical

circumstances determination is not supported by substantial evidence." *Id.* at __, Slip-Op. 11-

110, at 24.  In doing so, the court held that the Department's "application of the 25%

methodology to the 190-day period beginning at the initiation of the less than fair value

investigation through the Department's Preliminary Results is clearly authorized by *Zhejiang*

*IV*." *Id.* at __, Slip-Op. 11-110, at 19.  The court further held, however, that Commerce's critical

circumstances determination "lacks the support of substantial evidence because (1) the initiation

of the antidumping investigation cannot be said to have put plaintiff on notice that the prices set

by the Suspension Agreement were dumped prices, and (2) the prices importers paid did not

materially change from the period when the Suspension Agreement was in effect." *Id.* at __,

Slip-Op. 11-110, at 19–20.  The court then stated,

> as was shown in *Zhejiang IV*, Commerce had other evidentiary tools that it might
> have used to produce the substantial evidence needed to make its case.  For
> instance, in Potassium Permanganate From the PRC, 48 Fed. Reg. 57,347 (Dec.
> 29, 1983) (final determination of sales at less than fair value) ("*Potassium*
> *Permanganate*"), Commerce found that the importers were *actually aware* of the
> pricing of the merchandise for non-Chinese sources, and were, therefore, "aware
> of the entire range of pricing in a marketplace where pricing was a major factor in
> determining sales."  In *Nippon Steel Corp. v. United States*, 24 CIT 1158, 118 F.
> Supp. 2d 1366 (2000), this Court listed "numerous press reports [and] falling
> domestic prices resulting from rising imports" to support its determination.

*Id.* at __, Slip-Op. 11-110, at 23.  Hence, the court invited Commerce to explore the use of the

analysis found in *Potassium Permanganate* along with the kind of evidence presented in *Nippon*

*Steel* as a means for determining the existence of critical circumstances.  Accordingly, the court

directed, "[o]n remand, the Department may use any analysis permitted by *Zhejiang IV* to

complete its critical circumstances review, provided that it not use evidence prohibited by this

opinion.  In addition, Commerce may, in its discretion, reopen the record."  *Id.* at __, Slip-Op.

11-110, at 24.

The Department issued its preliminary Third Remand Results and received comments

from both plaintiffs and defendant-intervenors.  At the request of defendant-intervenors,

Commerce also "re-open[ed] the record on a limited basis . . . to solicit information 'concerning

importers' knowledge of prices of honey from all sources imported into the United States during

the time period after August 16, 2000.'"[4]  Third Remand Results at 5 (citation omitted).

On March 22, 2012, Commerce filed its Third Remand Results, finding that critical

circumstances did *not* exist because the Department did "not find that importers knew or should

have known that imports of subject merchandise . . . were at [less than fair value] prices."  Third

Remand Results at 3.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

**I.    Legal Framework**

Under 19 U.S.C. § 1673d(a)(3), "critical circumstances" exist when

(A) . . . the person by whom, or for whose account, the merchandise was imported
knew or should have known that the exporter was selling the subject merchandise

---

[4]      After reopening the record, defendant-intervenors submitted new factual
information, "including United States pricing data on honey, trade journal articles, and testimony
from the investigation at the International Trade Commission," and plaintiffs submitted an
affidavit from an importer.  Third Remand Results at 6.

at less than its fair value and that there would be material injury by reason of such
sales,

*and*

(B) there have been massive imports of the subject merchandise over a relatively
short period.

19 U.S.C. § 1673d(a)(3) (emphasis added).

If the criteria for critical circumstances are met, then antidumping duties go into effect

ninety days earlier than the effective date of antidumping duties in the absence of critical

circumstances.  19 C.F.R. § 351.206(a).  While the statute specifies that this extension of

antidumping duties is appropriate when importers "knew or should have known" that the price

was below fair value and would materially injure domestic industry, the statute does not specify

how the presence of such knowledge should be determined.  Therefore, Commerce has adopted a

general practice of imputing knowledge (without requiring evidence of actual knowledge) when

a calculated dumping margin for the POI is greater than twenty-five percent.

In the Final Results, "[t]he Department found evidence of massive imports of subject

merchandise by [plaintiffs] within a relatively short period," thus fulfilling the second criterion

for critical circumstances under 19 U.S.C. § 1673d(a)(3)(B).  Third Remand Results at 17 n.5.

The court sustained this finding and plaintiffs did not challenge this aspect of the Final Results.

*Zhejiang I*, 27 CIT at 1849 ("Plaintiffs do not challenge Commerce's massive imports

determinations.").  Hence, the remaining issue is whether importers had or should have had

knowledge that dumping was occurring, the first prong of 19 U.S.C. § 1673d(a)(3).

In the Third Remand Results, Commerce states that it normally employs its twenty-five

percent methodology to impute knowledge, but that "the Court . . . made clear [in *Zhejiang V*]

that any prices that were consistent with the suspension agreement prices cannot, alone, serve as

substantial evidence that the relevant party knew or should have know[n] that the sales were at

[less than fair value]." Third Remand Results at 18 (citing *Zhejiang V*, 35 CIT at __, Slip Op.

11-110, at 22–23). After reopening the record, "[t]he Department [did] not identif[y] any sales

of subject merchandise on the record that [were] inconsistent with the suspension agreement

prices." Third Remand Results at 18. For this reason, "consistent with the Court's opinion [in

*Zhejiang V*], the Department . . . examined the record to determine if there [was] any other

evidence demonstrating that the importers knew or should have known that the exporter was

selling subject merchandise at [less than fair value]." Third Remand Results at 18. Because it

failed to find such evidence, Commerce issued a negative critical circumstances determination.

Third Remand Results at 33.

Defendant-intervenors challenge the Third Remand Results, and urge the court to remand

the Results to Commerce once again. In support of their position, defendant-intervenors offer

four arguments.

## II.     Proof of Actual Knowledge of Dumping

Defendant-intervenors first argue that Commerce "narrowly interpret[ed] the Court's

remand instructions [in *Zhejiang V*] as requiring a finding that importers had *actual* knowledge

of dumping of Chinese honey to reach an affirmative critical circumstances determination and

rendering impossible the imputation of knowledge of dumping." Def.-Ints.' Cmts. 5.

Defendant-intervenors observe, however, that "actual knowledge of dumping is not a

requirement for an affirmative critical circumstances finding." Def.-Ints.' Cmts. 10.

Furthermore, defendant-intervenors urge that "the Court did not intend to require Commerce to

demonstrate actual importer knowledge of *dumping*, but instead to require evidence of actual

knowledge of *prices* and other information reasonably within the purview of importers from which knowledge of dumping could be imputed." Def.-Ints.' Cmts. 8.

Commerce, however, asserts that it did not adopt an "actual knowledge" requirement in the Third Remand Results. Def.'s Reply 15. Rather, the Department states that it first found that "the evidence does not demonstrate that U.S. importers had actual knowledge that honey from the PRC was priced at [less than fair value]." Third Remand Results at 27. It then further examined the record and found that the evidence did not support a determination that "importers knew *or should have known* that the exporter was selling subject merchandise at [less than fair value]." Third Remand Results at 17–18; Def.'s Reply 15 ("In addition to finding that the honey importers did not have actual knowledge of dumping, Commerce also 'examined the record to determine if there is any other evidence demonstrating that the importers . . . *should have known* that the exporter was selling the subject merchandise at [less than fair value].'") (quoting Third Remand Results at 18). For this reason, Commerce argues that it did not rely on an "actual knowledge" requirement to support its determination.

A review of the Final Results reveals that the Department did not rely solely upon an "actual knowledge of dumping" standard, despite defendant-intervenors' arguments to the contrary. Indeed, Commerce searched the record for any indication "that importers knew *or should have known* that imports of subject merchandise . . . were at [less than fair value] prices." Third Remand Results at 3 (emphasis added). As shall be seen, while the Department was able to find some evidence that importers were knowledgeable about the honey industry and pricing in general, absent from the record was evidence that they knew, or could be charged with knowing, that these prices were at less than fair value, rather than simply low. Therefore, the

Department did not unlawfully impose an "actual knowledge of dumping" requirement on its

critical circumstances analysis.

## III.     Alternative Methodologies for Imputing Knowledge

Defendant-intervenors also object to Commerce's treatment of the alternative

methodologies noted by the court in *Zhejiang V*. *See Zhejiang V*, 35 CIT at __, Slip Op. 11-110,

at 23 ("Commerce had other evidentiary tools that it might have used to produce the substantial

evidence needed to make its case.  For instance, in [*Potassium Permanganate*] . . . , Commerce

found that the importers were *actually aware* of the pricing of the merchandise for non-Chinese

sources, and were, therefore, 'aware of the entire range of pricing in a marketplace where pricing

was a major factor in determining sales.'  In *Nippon Steel Corp.* . . . , this Court listed 'numerous

press reports [and] falling domestic prices resulting from rising imports' to support its

determination.") (citations omitted).

Had the Department correctly employed the methodologies from *Potassium*

*Permanganate* and *Nippon Steel*, defendant-intervenors insist that it would have identified record

evidence to support a finding of importer knowledge.  Def.-Ints.' Cmts. 6–7 (*Zhejiang V* "permit[s]

Commerce to impute knowledge of dumping using the 25 percent test if supported by substantial

evidence of the type that Commerce had relied upon and the Court had upheld in Potassium

Permanganate and Nippon Steel.  Such evidence includes broad knowledge of market prices for

various sources of the allegedly dumped product and the presence of falling prices resulting from

rising subject imports.").  Consequently, defendant-intervenors believe that the evidence they have

placed on the record, which they contend is the kind of evidence found in *Potassium Permanganate*

and *Nippon Steel*, could have been used by Commerce on remand, in combination with the twenty-

five percent methodology, to impute knowledge of sales of honey at less than fair value.  Put another

way, defendant-intervenors claim that knowledge of low prices together with margins determined to be twenty-five percent or more would be sufficient to impute knowledge that the honey was dumped.

In response, Commerce first asserts "that as a result of the passage of time and the changes made to the statute and Commerce's non-market economy analysis, the methodology used in *Potassium Permanganate* to find critical circumstances was no longer reasonable." Def.'s Reply 6; Third Remand Results at 20 ("The Department no longer considers the analysis used in *Potassium Permanganate* an appropriate framework for determining critical circumstances because export prices from a broad range of third countries may not be representative of normal value for a PRC product. In the nearly 30 years since the agency issued its determination in *Potassium Permanganate*, . . . the Department's [non-market economy] methodology have changed significantly.").

Specifically, in a non-market economy country situation, "the Department now determines the existence of dumping, and of critical circumstances, by comparing a product's U.S. prices to normal value calculated using factors of production from an economically comparable country, and not by comparing U.S. prices to the prices of that product from other countries exporting the product, *regardless of economic comparability*." Third Remand Results at 21 (emphasis added). That is, in *Potassium Permanganate*, the Department based its critical circumstances determination on a direct comparison of the price of the potassium permanganate from the PRC (a non-market economy country) to the price of potassium permanganate imported from Spain (a market economy country). *See* Third Remand Results at 21 n.8. Under the Department's critical circumstances methodology that is used today (i.e., the twenty-five percent methodology), surrogate prices for the factors of production are used to determine normal value and that value is compared to the U.S. price to determine a dumping margin. If the margin is twenty-five percent or more, this can result in a critical circumstances determination based on

imputation of knowledge of dumping. Thus, for Commerce, because its critical circumstances methodology has matured to take into account actual evidence of dumping, the price comparisons found in *Potassium Permanganate* simply have no role in determining critical circumstances because they have no role in a less than fair value determination.

Nevertheless, based on the court's citation of earlier critical circumstances findings, the Department reopened the record and made the price comparisons defendant-intervenors sought. Third Remand Results at 23–32. To this end, in order "to comply with the Court's remand order, Commerce examined the evidence in light of *Potassium Permanganate* and *Nippon Steel* [and] found that even using these methodologies, substantial evidence did not support a finding that United States importers knew or should have known honey . . . from China was being sold at less than fair value." Def.'s Reply 6–7. As shall be seen, the Department reached its conclusion based on its finding that, although the importers were generally aware of honey prices, the level of awareness did not rise to the level found in these prior investigations.

Finally, the Department emphasized the court's statement in *Zhejiang V* "that a critical circumstances determination based solely on prices that are 'broadly the same' as those established under the Suspension Agreement, even if taken from the period following the Suspension Agreement's termination, cannot be supported by substantial evidence." *Zhejiang V*, 35 CIT at __, Slip-Op. 11-110, at 22–23. Here, "the record demonstrates that U.S. importers stated that the Chinese government's quota licensing system kept prices at the same or higher levels than those at the time of the Suspension Agreement." Third Remand Results at 32. That is, the prices on the record for the period following the termination of the Suspension Agreement were the same as or higher than the prices established by the Suspension Agreement. Third Remand Results at 32. Therefore, the Department believes that its finding comported with the

court's decision in *Zhejiang V*, which held that a critical circumstances determination would not

be supported by substantial evidence if it were based on prices that were "broadly the same" as

those in the Suspension Agreement.  *Zhejiang V*, 35 CIT at __, Slip-Op. 11-110, at 22–23.

      Based on the foregoing, the court finds that Commerce reasonably considered the

alternative methodology used in the critical circumstances determination made in *Potassium

Permanganate* and the kind of evidence found in *Nippon Steel* and determined that they did not

lead to an affirmative critical circumstances determination in this case.  First, Commerce has

convincingly explained why the analysis performed in *Potassium Permanganate* is no longer a

valid method of determining knowledge of sales having been made at less than fair value.  *See*

Third Remand Results at 21–22 ("[A] comparison of U.S. sales prices of subject merchandise

from the country under investigation to sales prices of the same merchandise sold into the United

States from other countries, . . . [can no longer] be a reliable indicator of whether or not sales of

subject merchandise under investigation are being sold at [less than fair value].").  This is

because the standard found in the statute is knowledge of dumping.  Therefore, the critical

circumstances determination in *Potassium Permanganate*, which was based on a direct

comparison of the prices of the potassium permanganate from the PRC to the prices of potassium

permanganate imported from Spain, would not be used today to establish that sales were made at

less than fair value.  Today, determinations of sales at less than fair value in a non-market

economy country are derived from normal value, which is calculated using the factors of

production from a surrogate country.  *See* Third Remand Results at 21 n.8.  Thus, the

Department's former methodology based on a price comparison alone would reveal nothing of

knowledge of dumping, while the methodology used today would.

Commerce's determination as to whether a critical circumstances methodology will result in valid results is entitled to deference. *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001) ("[S]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference."); *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1573 (Fed. Cir. 1994). Here, it is difficult to see how, under the facts of this case, Commerce's former price analysis would have been useful in making a determination that, according to the statute, must be based on an actual or imputed knowledge of dumping. 19 U.S.C. § 1673d(a)(3)(A); *see* Sept. 26 Order at 13 ("Price suppression and sales at less than fair value are just not the same thing.").

Moreover, as the review of evidence later in this opinion reveals, the Department reasonably attempted to use the "other evidentiary tools" identified by the court and by defendant-intervenors. In doing so, Commerce concluded that the evidence in this case would not have supported an affirmative critical circumstances determination, even if the *Potassium Permanganate* or *Nippon Steel* analyses were valid. The evidence only revealed that importers had a general knowledge of honey prices that were equal to or higher than those found in the Suspension Agreement. Third Remand Results at 27. Thus, the more particularized knowledge of prices found determinative in *Potassium Permanganate* is absent here.

Finally, the Department examined the record of prices during the 190-day period between the initiation of the investigation and the issuance of the Preliminary Results and found that all of the prices were "'broadly the same' as those established under the Suspension Agreement." Third Remand Results at 27 (citation omitted). As noted, the Federal Circuit has found that imputation of knowledge of dumping is incompatible with sales of merchandise that comply with the prices found in the Suspension Agreement. *Zhejiang II*, 432 F.3d at 1368 ("[I]t strains

credibility to suggest that Commerce could establish minimum prices for honey designed to

'prevent the suppression or undercutting of price levels of the United States honey products' and

then determine that U.S. importers purchasing honey in accordance with these pricing guidelines

should have known these sales would be found to be at less than fair value.") (citation omitted).

Therefore, in order to overcome the Federal Circuit's holding and make an affirmative critical

circumstances finding, Commerce would have had to find evidence of actual knowledge of

dumping or evidence from which knowledge of dumping could be imputed.  Because the record

did not contain this evidence, Commerce was unable to support with substantial evidence an

affirmative critical circumstances determination in light of the court's statement in *Zhejiang V*

that "a critical circumstances determination based solely on prices that are 'broadly the same' as

those established under the Suspension Agreement, even if taken from the period following the

Suspension Agreement's termination, cannot be supported by substantial evidence."  *Zhejiang V*,

35 CIT at __, Slip-Op. 11-110, at 22–23.

        In summary, the court holds that the Department is correct that the methodologies found

in *Potassium Permanganate* and *Nippon Steel* would not yield reliable indications of critical

circumstances, and it did not err in its use of the methodologies found in *Potassium*

*Permanganate* and *Nippon Steel*.

## IV.     Consideration of the Record Evidence as a Whole

        In a related argument, the defendant-intervenors' next claim is that Commerce failed to

consider the record evidence as a whole, as is required by the *Potassium Permanganate*

methodology.  If the Department had done so, defendant-intervenors claim, the record now

contains information "that should lead to the conclusion that importers had sufficient knowledge

of market pricing to be on notice that imports of honey from China during the 190-day period

were likely to be dumped in light of the more than 25 percent dumping margins on such

imports."[5]  Def.-Ints.' Cmts. 18.  Hence, the defendant-intervenors assert that new evidence they

have placed on the record, including industry, non-industry, and government publications and

findings, is of the type that was important in *Potassium Permanganate*, and supports the

imputation of knowledge based on the twenty-five percent methodology.  Therefore, "[b]ased on

these facts, and the application of the 25 percent rule to imports during 190-day period, importers

knew or should have known that the Chinese honey import prices were less than fair value."

Def.-Ints.' Cmts. 19; Def.-Ints.' Cmts. 7 ("[T]he record now contains such substantial evidence

to support Commerce's use of the 25 percent test . . . , including evidence of importer knowledge

of pricing from various sources and a variety of other evidence that should have led the importers

to have reason to know that dumping was occurring.").

     First, defendant-intervenors claim that record evidence demonstrates that importers were

actually aware of market pricing of honey from the relevant source countries.  Def.-Ints.' Cmts.

19–20, 24.  According to these domestic producers, they placed evidence on the record which

demonstrates that importers had actual knowledge of prices from which knowledge of dumping

---

    [5]      In particular, defendant-intervenors argue that the twenty-five percent
methodology can now be supported with substantial evidence of the type used in making the
affirmative critical circumstances determination in *Potassium Permanganate*, including evidence

    that: (1) Argentina and China were the primary import sources for honey and
there [was] a relatively small number of sources of honey; (2) U.S. importers
were fully aware of honey prices from all major sources; (3) U.S. importers were
aware of the Suspension Agreement's failure to prevent price depression, the
Suspension Agreement's expiration, and of an imminent dumping case against
Chinese honey imports; (4) Chinese honey prices were 24.5 percent less than
honey from fairly-priced source countries during the 190-day period from the
initiation to the preliminary determination; and (5) massive imports of Chinese
honey occurred during the same period.

Def.-Ints.' Cmts. 18–19.

could be imputed.  Specifically, they point to the widespread reporting of honey pricing in government and industry publications and newspaper articles.  Def.-Ints.' Cmts. 20 ("The market knowledge came not only from their experience in importing from multiple sources, . . . it also came from the widespread publication of honey prices by the Agricultural Marketing Service . . . of the United States Department of Agriculture.").

Second, defendant-intervenors "submitted numerous newspaper articles, industry publications, and government publications which demonstrate that importers had knowledge of . . . specific differentials between such prices, decreasing prices of Chinese honey imports, and that the filing of a new dumping case was imminent."  Def.-Ints.' Cmts. 31; *see also* Def.-Ints.' Cmts. 33–34 ("All of the mainstream news articles show that importers and the general public were well aware of the relative prices of honey from different sources; that Chinese honey was the cheapest source and was being dumped on the U.S. market; and that the filing of a new dumping case was imminent.  It is thus unreasonable for Commerce to conclude that U.S. importers of honey did not know these facts as well.").

Third, defendant-intervenors contend that testimony before the ITC, ITC findings, and ITC staff reports demonstrate that importers had knowledge of honey market prices and underselling.  In particular, defendant-intervenors state that "the importers themselves specifically testified at the preliminary staff conference of the ITC that they had such broad knowledge."  Def.-Ints.' Cmts. 25.  Furthermore, the ITC "concluded that the significant price effects and volume effects of imports of honey from China had a significant adverse impact on the domestic industry, leading to a finding that there was a reasonable indication of material

injury by reason of the subject imports."[6]  Def.-Ints.' Cmts. 27 (citation omitted).

In response, Commerce notes that, as a preliminary matter, "[o]f the total of eight non-industry newspaper articles placed on the record, five of these were published while the suspension agreement was still in effect.  Therefore, the Department believes that[, in accordance with the Federal Circuit opinion in *Zhejiang II*,] these articles could not have alerted honey importers that the honey they were importing from the PRC was being sold for [less than fair value]."  Third Remand Results at 30.

Next, Commerce disputes both the probative value and the sufficiency of the evidence highlighted by defendant-intervenors.  That is, for Commerce, the material defendant-intervenors placed on the record neither demonstrates that plaintiffs had a detailed knowledge of honey pricing, nor that plaintiffs could be said to have either actual or imputed knowledge of dumping, even using the *Potassium Permanganate* methodology.  This is especially true because the record evidence indicates that there were a large number of companies exporting honey into United States from at least seven countries, making it difficult to assume that honey importers could be charged with knowledge of pricing from all sources.  Def.'s Reply 11; Third Remand Results at 24–25.  This is in contrast to the "closely knit industry" in *Potassium Permanganate* where the product was only available from two countries other than the PRC, and therefore importers could be charged with being "acutely aware of pricing from *all* sources."  Third Remand Results at 24; Third Remand Results at 23 ("[T]he agency found that the number of

---

[6]          "Specifically, imports of honey from China were, on average, 23.2 percent below those from all other countries beside Argentina (which with China was then subject to an ongoing antidumping duty investigation) during the period Commerce has identified as relevant. This is higher than the 22 percent price difference (underselling margin) Commerce relied on in Potassium Permanganate to justify its critical circumstances finding."  Def.-Ints.' Cmts. 31 (citations omitted).

companies that produced and marketed potassium permanganate was limited to a single company

in the United States (Carus Chemicals), a single company in Spain (Asturquimica), and several

companies in the PRC.").

As to the content of the articles themselves, the Department agrees that "all of the

newspaper articles, including those in both industry and non-industry publications, indicate that

importers knew the general conditions in the U.S. honey market, and were aware that low-priced

honey was being imported from other countries."  Third Remand Results at 31.  The Department

notes that although the prices were low, they were equal to or higher than those found in the

Suspension Agreement.  Consequently, the Department found that the facts did not support

defendant-intervenors' contentions.

Commerce also returns to its argument that evidence of knowledge of low-priced sales, or

even of undercutting, may not be used to demonstrate actual knowledge or to impute knowledge

of dumping, and thus that the *Potassium Permanganate* methodology is no longer an appropriate

means of determining knowledge of or imputing knowledge of dumping.  Therefore, "[w]hile

these prices may indicate an awareness of the pricing levels of PRC and Argentine honey

imports, . . . the Department determines a dumping margin by calculating the difference between

a producer's normal value and U.S. price, and not by calculating the difference in price between

PRC goods and third country goods sold in the United States."  Third Remand Results at 31.

As to the information from the ITC, Commerce notes that defendant-intervenors "state

that the ITC determined that the prices and volumes of PRC honey imports had a significant

negative impact on the U.S. honey industry and was a reasonable indication of material injury by

reason of subject imports."  Third Remand Results at 28.  The Department reiterates, however,

that evidence of low prices and high volume, or even of injury, are not evidence of sales at less

than fair value.  Third Remand Results at 31 ("[T]he Department does not agree with [defendant-intervenors' contention that knowledge of low-priced imports generally, or of the specific prices of these imports, necessarily indicates the U.S. importers knew or should have known that honey from the PRC was being sold at [less than fair value].").

The court agrees with defendant that, taken as a whole, the record evidence indicates some awareness of pricing and other market factors among U.S. honey importers.  It does not, however, demonstrate that importers had knowledge of sales at less than fair value during the relevant period, nor does the record contain evidence from which such knowledge could be imputed.

First, Commerce correctly disregarded the information placed on the record by the defendant-intervenors that was from the period when the Suspension Agreement was still in effect because this information cannot form the basis for the imputation of knowledge.  *See Zhejiang II*, 432 F.3d at 1368 ("[I]t strains credibility to suggest that Commerce could establish minimum prices for honey designed to 'prevent the suppression or undercutting of price levels of the United States honey products' and then determine that U.S. importers purchasing honey in accordance with these pricing guidelines should have known these sales would be found to be at less than fair value.") (citation omitted).

Second, as noted, "in prior critical circumstances determinations [(i.e., those conducted prior to the adoption of the 25% methodology)], the Department had based its affirmative critical circumstances determination on the agency's finding that 'importers were actually aware of the pricing of the merchandise for non-Chinese sources, and were, therefore, aware of the entire range of pricing in a marketplace where pricing was a major factor in determining sales.'"  Third Remand Results at 2–3 (quoting *Zhejiang V*, 35 CIT at __, Slip Op. 11-110, at 23).  In *Potassium*

*Permanganate*, for example, "the Department found that it was reasonable to rely on an *assumption* that U.S. importers were aware of prices from Spain, because the subject merchandise was produced and marketed by a limited number of companies from within a similarly limited number of countries." Third Remand Results at 24.

Here, as noted, the Department found that the evidence "demonstrates that United States importers were aware to some degree of world market prices of honey, but fails to conclusively establish that they were aware of the full range of prices. Specifically, the evidence establishes that at least seven countries—Argentina, Canada, Chile, Mexico, China, Uruguay, and Vietnam—exported honey to the United States, and that other sources of honey imports may exist." Def.'s Reply 11; Third Remand Results at 24.

A review of the evidence confirms that the Department correctly found that, in contrast to the "closely knit industry acutely aware of pricing from *all* sources" that was present in *Potassium Permanganate*, today's honey industry is composed of a large number of companies that conduct business in many countries, thereby reducing the possibility of awareness of "pricing from all sources." Third Remand Results at 24; Third Remand Results at 26–27 ("[W]hile U.S. importers were aware, to some degree, of world market prices of honey, the evidence does not conclusively demonstrate that they were aware of the full range of prices, as they were in *Potassium Permanganate*, because of the more numerous countries from which honey was, or could have been, exported to the United States."). In other words, in *Potassium Permanganate*, unlike in this case, there were so few exporters of potassium permanganate that it would be difficult to find that a U.S. importer of potassium permanganate was not intimately familiar with the pricing from the limited number of sources.

Next, the evidence that defendant-intervenors cite as showing actual knowledge of dumping or actual knowledge that plaintiffs' prices were below the domestic cost of production does not tend to prove their case. That is, defendant-intervenors rely on evidence (i.e., the newspaper articles, industry publications, and government publications) that demonstrates only that readers of this material would be made aware of general pricing conditions and other market factors, including the relatively low prices for Chinese honey, but not that such low prices were the result of sales at less than fair value. In addition, the evidence shows that plaintiffs were aware that these prices, while low, were equal to or greater than those found in the Suspension Agreement, prices which the Federal Circuit has found would preclude an imputation of knowledge of dumping. In like fashion, the ITC evidence shows that low prices were causing injury, but says nothing about prices being at less than fair value.

Therefore, Commerce was reasonable in its conclusion that, taken as a whole, the evidence did not show that plaintiffs either had, or could be charged with having, knowledge that honey was being dumped by Chinese exporters during the 190-day period between the initiation of the investigation and the issuance of the Preliminary Results.

## V.    The Import Surge

The defendant-intervenors' final argument is that the massive increase in honey imports from the PRC, which Commerce found in its original affirmative critical circumstances determination, occurred in response to the initiation of the Second Investigation. Def.-Ints.' Cmts. 13–16. For this reason, defendant-intervenors assert that "[i]mporters must have had ample reason to believe that they were buying these imports at dumped prices at the time they made their decision to accelerate their imports, because if they didn't have such reason, they would have had no reason to rush in the imports, and the[re] would have been no surge." Def.-

Ints.' Cmts. 36.  According to defendant-intervenors, "there was a substantial surge, which the importers obviously undertook because they knew or suspected that they were paying dumped [prices] for the imports."  Def.-Ints.' Cmts. 36.

In response, Commerce notes that, under the statute, "the Department must base its affirmative critical circumstances determination on two <u>separate</u> findings—one with regard to importers' knowledge of [less than fair value] pricing and the other with regard to a surge of imports."  Third Remand Results at 29.  Here, "Commerce had already determined that a surge of imports over a relatively short period of time existed, thereby satisfying one of the two statutory requirements.[7]  This finding, however, does not support nor does it satisfy the separate statutory requirement of establishing importer knowledge of dumping."  Def.'s Reply 18.  In other words, for Commerce, defendant-intervenors have conflated the two separate statutory requirements for a finding of critical circumstances, and have attempted to bootstrap the finding of a surge to necessarily require a finding that plaintiff knew or should have known that honey was being sold at less than fair value.

The court agrees with defendant that the import surge is a separate statutory requirement necessary for a critical circumstances determination, but is not, standing alone, sufficient for such a finding.  Were this not the case, evidence of a surge would be the only criterion necessary for an affirmative critical circumstances determination.  The import surge, moreover, does not speak to the first criterion of importers' knowledge, which has been the crux of these lengthy proceedings.

---

[7]        In particular, in the Final Results, "[t]he Department found evidence of massive imports of subject merchandise by [plaintiffs] within a relatively short period," thus fulfilling the second criterion for critical circumstances under 19 U.S.C. § 1673d(a)(3)(B).  Third Remand Results at 17 n.5.

That this is the case can be seen from plaintiffs' observations that there may be many

reasons for a surge in imports, other than importer knowledge that dumping is occurring. *See*

Pl.'s Br. 10 ("[P]erhaps the most rational reason why a company would purposely accelerate

imports after an antidumping duty investigation is commenced would be to avoid the uncertainty

which arises when merchandise is subject to 'suspension of liquidation,' as distinguished from a

belief that the merchandise is actually dumped. An importer's liability for antidumping duty is

only set in stone when its entries are liquidated, after an Annual Review is completed and after

litigation is concluded, an event which may not take place for many years after entry."). Thus,

while it may be that the importers increased their honey purchases in anticipation of the

investigation, the surge alone does not amount to substantial evidence that they were aware, or

should have been aware, that the honey was being dumped. For these reasons, Commerce's

conclusion that a finding that there was a surge of honey imports does not necessarily result in

the imputation of knowledge of dumping, is sustained.

## CONCLUSION

For the foregoing reasons, Commerce's determination that critical circumstances did not

exist because U.S. importers did not possess the requisite knowledge that exporters were selling

the subject merchandise at less than fair value was supported by substantial evidence and made

in accordance with law.

Accordingly, Commerce's Final Results of Redetermination are sustained.

                                                        _____
                                                              /s/ Richard K. Eaton
                                                              Richard K. Eaton

Dated: June 18, 2013
           New York, New York

# PROOF OF SERVICE

## ZHEJIANG NATIVE PRODUCE V US, 2013-1574

I hereby certify that two (2) copies of the attached Brief were served via first-class mail, on this 18th day of November 2013, upon the following parties:

Jane Chang Dempsey
**U.S. Department of Justice**
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

R. Alan Luberda
**Kelley Drye & Warren, LLP**
3050 K Street, NW.
Suite 400
Washington, DC 20007-5108


/s/*Mark E. Pardo*
Mark E. Pardo
Grunfeld Desiderio Lebowitz
Silverman & Klestadt, LLP

# CERTIFICATE OF COMPLIANCE

     I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains 7,382 words including text, footnotes and headings.  This is within the limit of 14,000 words set by Fed. R. App. P. 32(a)(7)(B)(i)


*/s/ Mark E. Pardo*
Mark E. Pardo

Grunfeld, Desiderio, Lebowitz,
Silverman & Klestadt, LLP
1201 New York Ave., NW, Ste 650
Washington, D.C. 20005

November 18, 2013

8849068_3